1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| W.A., a minor, by and through his Guardian Ad Litem, Victoria Anderson, <br><br> Plaintiff, <br><br> v. <br><br> PANAMA-BUENA VISTA UNION SCHOOL DISTRICT, <br><br> Defendant. | Case No.  1:21-cv-00539-JLT-CDB <br><br> MEMORANDUM DECISION AND ORDER AFFIRMING ADMINISTRATIVE DECISION <br><br> [10-day deadline for filing Joint Status Report] |

## I. INTRODUCTION

This case concerns an administrative due process hearing under the Individuals with Disabilities Education Act. 20 U.S.C. § 1400 *et seq.*[1] Student, W.A. ("Student" or "W.A."), an 8 ½ year-old boy at the time the instant complaint was filed, asserts he has autism and attention deficit and hyperactivity disorder. He contends these conditions result in difficulty with social interaction and communication and conforming "to societal and school norms[,]" rendering him "a child with a disability" entitled to the benefits of IDEA and the California Education Code, including a free appropriate public education ("FAPE") in the least restrictive environment ("LRE").  (Doc. 1 at 1-3); *see also* 34 C.F.R. § 300.114(a); Educ. Code § 56040.1.

Student alleges his autism and ADHD manifested in escalating verbal and physical abuse of

---

[1] California's implementation of the IDEA is codified at California Education Code § 56000 *et seq.*

1    classmates, teachers, and staff.  (*Id.*)  Student attends school in the Panama-Buena Vista Union

2    School District, and he asserts the District did not perform an adequate assessment of suspected

3    disabilities in compliance with California or federal law.  (Doc. 1 at 3, 5-6.)  District is a California

4    public school district that receives federal funding.  (Doc. 1 at 3.)

5        Student, by and through his mother and guardian ad litem, Victoria Anderson, brings this

6    appeal of an education due process hearing and decision pursuant to the IDEA, 20 U.S.C. §

7    1415(i)(2)(A).  (Doc. 1.)  Student contends that the decision of Administrative Law Judge June

8    Lehrman of the California Office of Administrative Hearings ("OAH") erred in several ways,

9    denying him a FAPE.  Student also contends the District engaged in disability discrimination in

10   violation of the Americans with Disability Act, 42 U.S.C. § 12101, and the Rehabilitation Act of

11   1973, 29 U.S.C. § 794(a).[2]  (*Id.*)

12       Student seeks relief including reversal-in-part of the ALJ's decision; a compensatory

13   education; appropriate placement and related services; funding for an independent educational

14   evaluation ("IEE") and an individualized education program ("IEP") meeting to consider it; general

15   and special damages and costs to properly educate Student; attorneys' fees as prevailing party and

16   legal costs; and other and further just and proper relief.  (Doc. 1 at -14-15.) The District contends

17   the ALJ's decision was correct and should be upheld.[3]  (*See* Docs. 21, 31.) For the reasons

18   discussed below, the Court **AFFIRMS** the ALJ's decision on appeal.

19                              **II. FACTUAL BACKGROUND**

20       Student resided within the District's boundaries and attended Stine Elementary School

21   ("Stine') for kindergarten and Castle Elementary School ("Castle") for first grade.  (Doc. 28-5 at

22   236, 240; Doc. 28-6 at 90.) During 2017-2018, Student's pre-kindergarten year, he was observed to

23   curse and engage in physical aggression and behaviors that were not appropriate.  (Doc. 1 at 4.)

24       During 2018-2019, Student's kindergarten year, he was a good student academically, but his

25   negative behaviors increased dramatically.  (Doc. 1 at 4)  For example, "[h]e would say 'fuck' and

26

27   [2] This Decision and Order addresses only Student's administrative appeal.
     [3] The Court has jurisdiction to hear this appeal under 20 U.S.C. § 1415(i)(2)(3), and Student has exhausted his

28   administrative remedies.  (Doc. 1 at 8); see also 20 USC §§ 1415(i)(2)(3)(A), 1415(l); 34 CFR 300.516; Educ. Code §§
     56043(w), 56505(h)(k).

                                        2

1   'bitch' at school to teachers, staff and other children." (*Id.*)  In addition,  he "was physically
2   aggressive and threatening toward others." (Doc. 1 at 4-5); *see also* Doc. 28-6 at 216-19.)  He
3   threatened violence.  (*See* Doc. 28-6 at 178-81.)  He was suspended for hitting his teacher and had
4   25 formal behavioral incidents, thirteen major and twelve minor.  (*Id.*; Doc. 1 at 4-5; Doc. 28-5 at
5   240.) As a result, Student was frequently removed from the classroom.  (Doc. 1 at 5.)  Additionally,
6   "[n]umerous calls home were made by the school about his behavior" and "two formal [student
7   success team] meetings were held to address his negative behavior."  (*Id.*)

8        During summer school in 2019, Student was physically aggressive with school staff and
9   eventually stabbed an aide with a pencil." (*Id.* at 5-6.)  As a result, Student was removed from the
10  summer school program.  (*Id.* at 6; *see also* Doc. 28-5 at 250.)

11       During 2019-2020, Student's first grade year, District psychologist Andrea Hunt's May 28,
12  2019 Lesson Plan Implementation Guide to Address Behavior-Tier 2 ("Tier 2 Plan") was used by
13  fellow District psychologist Stephanie Elrod to manage his behavior at Castle.  (Doc. 28-5 at 204-
14  05; *see also* Doc. 28-3 at 63-66; Doc. 28-6 at 760-67)  Still, Student continued his physical
15  aggression toward peers (Doc. 1 at 6), which soon escalated to inappropriate cursing and increased
16  physical assaults including elbowing another student several times; ramming his desk into other
17  desks, slapping a student and head-butting the teacher; forcibly grabbing another student's
18  backpack; grabbing and twisting another student's hand; flipping chairs and desks over; pushing the
19  teacher; making inappropriate noises; throwing a pencil; throwing an object hitting another
20  student's head; throwing folders and flipping his desk; screaming and throwing books; kicking
21  chairs; and twisting and bruising another student's arm.  (*Id.; see also* Doc. 28-3 at 93-101; Doc.
22  28-5 at 250-53; 1049, 1253-58.)  He also "bruised and battered teachers."  (*Id.*)  The school
23  principal became so concerned that Student's behavior might lead to a lawsuit that she kept a log of
24  injuries incurred by teachers and staff.  (*Id.*)  Student was suspended and repeatedly removed from
25  class.  (*Id.*)  Student increasingly struggled to complete his school work, was typically off-task,
26  refused to do work, eloped from the classroom, engaged in frequent verbal outbursts, and was
27  physically aggressive.  (*See* Doc. 28-4 at 284.)
28  ///

3

### III. PROCEDURAL HISTORY

**A.     Events Preceding the Administrative Hearing**

On March 27, 2019, during Student's kindergarten year in a general education classroom, his mother submitted a written request that his negative behaviors and aggression in the classroom be assessed.  (*See* Doc. 28-3 at 9-10, 33-34.)  On April 2, 2019, the District and Student's mother agreed to assess the Student in the areas of: academic achievement, health, intellectual (cognitive) development, social/emotional, and adaptive behavior, (*see* Doc. 28-3 at 36), which resulted in an assessment plan dated April 2, 2019, and a psycho-educational assessment report prepared by Hunt dated May 28, 2019.  (Doc. 28-3 at 43-62.)

On May 28, 2019, the District held an IEP meeting for Student, at which time he was initially assessed by District psychologist Hunt for eligibility for special education and related services.  (*See* Doc. 28-3 at 63-68; Doc. 28-5 at 236.)  Hunt, assisted by District psychologist Elrod, District special education teacher Charles Coleman, and others observed Student, reviewed records including Student's above noted behavioral incidents, provided Mother with a written questionnaire, and interviewed the kindergarten teacher and Student.  (*Id.*; *see also* Doc. 28-5 at 243.)  Hunt reviewed Student's prior assessments conduct by others, and she  assessed Student's cognitive abilities and educational achievements, finding him in the average range.  (*See* Doc. 28-5 at 233-45.)  Still, Hunt made only a limited behavioral assessment, did not purport to explain Student's increasing aggression and the ineffectiveness of informal interventions, and did not conduct or recommend an autism spectrum assessment.  (*Id.*)

Thereupon, the District determined that Student was not eligible for an IEP and he was not then provided with any special education and related services.  (Doc. 1 at 5; *see also* Doc. 28-3 at 43-68; Doc. 28-5 at 244-49.)  While the May 28, 2019 assessment found Student suffered from limited alertness due to attention deficit disorder or attention deficit hyperactivity disorder, the District concluded that Student was making satisfactory academic progress and thus not eligible for special education and related services.  (*See* Doc. 28-3 at 63-68; Doc. 28-5 at 247.)  Hunt developed the Tier 2 Plan to address Student's maladaptive behaviors.  Notably, at that time, Hunt opined that "access" was the hypothesized function of  Student's negative and aggressive behavior.  (Doc. 28-5

1   at 204.)

2          In August 2019, Student was diagnosed with ADHD and Disruptive Mood Dysregulation

3   Disorder ("DMDD") by his medical provider.  (*See* Doc. 28-3 at 84.) At Mother's request, in

4   October 2019, Elrod conducted a [Rehabilitation Act Section] 504 assessment, which resulted in an

5   October 21, 2019 Section 504 Accommodation Plan for aggressive behaviors impeding his

6   education.  (Doc. 28-3 at 84-91, 103-04.) On November 14, 2019, faced with Student's continuing

7   behavioral problems in First Grade notwithstanding the Tier 2 Plan, District psychologist Elrod

8   proposed another special education assessment of Student, in the areas of academic achievement,

9   health, intellectual development, and social/emotional functioning; Mother consented.  (*See* Doc.

10  28-3 at 106; *see also* Doc. 28-5 at 251.)

11         Student's suspected disabilities in areas of Other Health Impairment ("OHI") and Emotional

12  Disturbance ("ED") were assessed by District psychologist Elrod in a written psycho-educational

13  evaluation report dated December 19, 2019.  (*See* Doc. 28-3 at 117-225.)  Elrod concluded in her

14  December 19, 2019 report and updated Tier 2 Plan that the function of Student's physical

15  aggression was to "escape tasks or demands[,]" not "access to an item, activity, or person" as

16  previously found by Hunt.  (*See* Doc. 28-3 at 297-98.)  Elrod's assessment was reviewed at the IEP

17  team meeting on 12/19/19.  (*See Id. at* 117-299.)  Elrod's report noted that "[w]hen demands are

18  placed on [Student] . . . which he does not like, he immediately becomes angry and will resort to

19  cussing, yelling, throwing objects, flipping desks, tearing up materials, and/or hitting, kicking,

20  slapping adults and peers near him."  (Doc. 28-3 at 207.)

21         At its December 19, 2019 IEP team meeting which Mother attended, the District, found

22  Student was eligible for special education and related services under the categories of ED and OHI

23  based on his ADHD.  (*See* Doc. 28-3 at 117-299.)  Areas of need identified by the IEP team

24  included: academics (reading and math), and social/emotional behavioral functioning.  (*See Id.*)

25  The IEP team developed seven goals for Student in the areas of reading, math, and social/emotional

26  behavior, and recommended placement in a special day behavioral intervention class ("BIC") for

27  most of the school day, with the balance of the school day spent in a general education classroom.

28  (*See* Doc. 28-3 at 208-11.)  Mother did not consent to the IEP.  (*Id.*)  The District also offered

1  additional special education eligibility assessments for autism, speech and language ("S/L"),

2  functional behavior, educationally related mental health services ("ERMHS"), and occupational

3  therapy ("OT"). (*Id.*) Mother agreed to the additional assessments. (*See* Doc. 28-3 at 226.) In

4  January 2019, the District also agreed to fund an IEE for the psycho-educational assessment

5  completed May 28, 2019. (*See* Doc. 28-3 at 229-30.)

6  On February 12, 2020, the IEP team met in continuation of its December 2019 meeting.

7  (*See* Doc. 28-3 at 290-300.)   At that time, Mother consented to the updated Tier 2 Plan and  the

8  three social/emotional behavioral goals in the December 2019 IEP. (*Id.*) On February 28, 2020,

9  the IEP team again met in continuation of the December 19, 2019 IEP meeting to consider the

10  District's additional assessments. (*See* Doc. 28-4 at 1-303, Doc. 28-5 at 1-20.) District

11  psychologist Hunt, a Board Certified Behavioral Analyst ("BCBA") (Doc. 28-5 at 133) presented

12  the District's functional behavior assessment ("FBA") in which she concluded (as she did in her

13  May 2019 psycho-educational report) that "access" to an item/activity/person was the function of

14  Student's aggressive behavior. (Doc. 28-4 at 146-175; *see also* Doc. 28-4 at 1-145, 176-303; Doc.

15  28-5 at 1-20.) The IEP team, including Mother, reviewed Hunt's FBA along with the additional

16  assessments of Student, and the District's offer of an amended December 2019  IEP placement for

17  Student, along with a Behavioral Intervention Plan ("BIP", see Doc. 28-5 at 7-11) including three

18  replacement behavioral goals and two new ERMHS goals. (*Id.*.) Mother consented only to the

19  ERMHS goals and to counseling. (*Id.*)

20  On March 10, 2020, Mother requested that the District provide an FBA by an IEE. (*See*

21  Doc. 28-5 at 22; *see also* Doc. 1 at  7.)  In an April 21, 2020 prior written notice, the District denied

22  the request. (Doc. 28-5 at 24-28.) On June 26, 2020, the District filed with the OAH a due process

23  complaint against Student asking for a declaration that its FBA was adequate, and an order that it

24  need not pay for an FBA by an IEE (OAH Case No. 2020070003). (*See* Doc. 28-5 at 233.)

25  On September 9, 2020, Student filed with the OAH a due process complaint, asserting the

26  District failed to properly assess Student, denying him a FAPE (OAH Case No. 2020090289). (*Id.*)

27  On October 20, 2020, the District filed with the OAH a due process complaint seeking an order

28  allowing it to implement the December 19, 2019 IEP amended February 28, 2020 ("Amended

1  IEP") as a FAPE in the LRE, without parental consent (OAH Case No. 2020100652).  (*Id.*) The

2  three OAH cases were consolidated by the OAH for hearing before the ALJ and assigned OAH

3  Case No. 2020090289.  (*Id.*)

4  **B.      The Administrative Hearing**

5  The ALJ held the consolidated hearing in OAH Case No. 2020090289, via videoconference,

6  over thirteen days in January 2021.  (*Id.* at 234.) The ALI tried the following Issues:[4]

> Issue 1. Did Panama deny Student a FAPE, by failing to appropriately
> assess him in all areas of suspected disability from September 9, 2018
> through the filing of Student's complaint?

> Issue 2. Was Panama's February 2020 functional behavior assessment
> appropriate such that it need not fund an independent educational
> evaluation?

> Issue 3. Was Panama's IEP offer dated December 19, 2019 as amended
> February 28, 2020 necessary to provide Student a FAPE in the least
> restrictive environment such that it may be implemented without
> parental consent?

14  (*Id.*); *see also* Doc. 1 at 7.) On [March 15, 2021], the ALJ issued her sixty-eight-page decision,

15  finding that:

> Issue 1: Panama denied Student a free appropriate public education or
> FAPE, by failing to appropriately assess him in all areas of suspected
> disability from November 1, 2018 through February 28, 2020. Panama
> did not deny Student a free appropriate public education or FAPE, by
> failing to appropriately assess him in all areas of suspected disability
> from February 28, 2020 through the filing of Student's complaint.
> Student prevailed on Issue 1 for the period from November 1, 2018
> through February 28, 2020. Panama prevailed on Issue 1 for the period
> from February 28, 2020 through September 9, 2020.

> Issue 2: Panama's February 2020 functional behavior assessment was
> appropriate such that it need not fund an independent educational
> evaluation. Panama prevailed on Issue 2.

> Issue 3: Panama's IEP offer dated December 19, 2019 as amended
> February 28, 2020 was necessary to provide Student a FAPE in the least
> restrictive environment such that it may be implemented without
> parental consent. Panama prevailed on Issue 3.

26  (Doc. 28-5 at 295-96; *see also* Doc. 1 at 7-8.) The ALJ also found that as an equitable remedy on

27  Issue 1, the District was ordered to provide Student with 160 hours of specialized academic

---

28  [4] Student's Issue was "1"; District's Issues were "2" and "3."  (Doc. 28-5 at 233.)

instruction and 51.5 hours of behavior intervention services.  (Doc. 28-5 at 298-300; *see also* Doc. 1 at 7-8.)  The ALJ further ordered that the compensatory education hours be (1) provided by a certified non-public agency of Parents' choosing, (2) available through the end of the 2021-22 regular school year, and (3) if unused, they will expire on the last school day of the regular 2021-22 school year.  (*Id*.)  Student seeks the Court's review of the ALJ's findings on above Issues 2 and 3.

On March 30, 2021, Student commenced this federal proceeding by filing the instant complaint which includes this appeal.  (Doc. 1.)  The complaint alleges a First Cause of Action for violation of IDEA (20 U.S.C. §1400 *et seq*.; Educ. Code § 56500 *et seq*.), a Second Cause of Action for violation of the Americans with Disability Act (42 U.S.C. § 12101), a Third Cause of Action for violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794(a)), and a Fourth Cause of Action for Prevailing Party Attorneys' Fees Under IDEA and California Special Education Law (20 U.S.C. §1415(i)(3)(B)(i)(I)).  (*Id.*)

## IV.    STANDARDS OF DECISION

This action is brought pursuant to 20 U.S.C. § 1415(i)(2)(A), which provides that a party aggrieved by the findings and decision of a due process hearing conducted by a State educational agency has a right to bring a civil action in either state or district court.  Section 1415(i)(2)(C) provides:

> In any action brought under this paragraph, the court—
>
> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party; and
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

The court reviews the decision of the hearing officer *de novo,* giving due weight to the hearing officer's judgments regarding education policy.  *See Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176, 206 (1982) ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"); *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471–72 (9th Cir.1993) (district court's

1   authority under § 1415(e) plainly suggests less deference than is conventional in the review of

2   agency actions); *Adams v. State of Oregon,* 195 F.3d 1141, 1145 (9th Cir.1999) (recognizing that a

3   court should give "due weight to the hearing officer's administrative proceedings"); *N.B. v.*

4   *Hellgate Elementary Sch. Dist.,* 541 F.3d 1202, 1212 (9th Cir. 2008) (same); *Capistrano Unified*

5   *Sch. Dist. v. Wartenberg,* 59 F.3d 884, 892 (9th Cir.1995) ("The district court's independent

6   judgment is not controlled by the hearing officer's recommendations, but neither may it be made

7   without due deference" to them because this is what Congress intended in enacting 20 U.S.C. §

8   1415); *Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1311 (9th Cir.1987) ("How much

9   deference to give state educational agencies . . . is a matter for the discretion of the courts").

10       A court must be particularly deferential to a hearing officer's findings where they are

11   "thorough and careful," *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir. 1994), or where

12   they "are based on credibility determinations of live witness testimony." *J.S. v. Shoreline Sch.*

13   *Dist.,* 220 F.Supp.2d 1175, 1184 (W.D. Wash. 2002) (citing *Amanda J. ex rel. Annette J. v. Clark*

14   *County Sch. Dist.,* 267 F.3d 877, 887-89 (9th Cir.2001). "Complete *de novo* review of the

15   administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817

16   (9th Cir. 2007). The burden of proof is on the party challenging the administrative ruling. *L.M. ex*

17   *rel. Sam M. v. Capistrano Unified Sch. Dist.,* 556 F.3d 900, 910 (9th Cir. 2009) (citing *Clyde K. v.*

18   *Puyallup Sch. Dist., No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994), *superseded by statute as stated in*

19   *L.M.,* 556 F.3d at 910)) ("In an action for judicial review of an administrative decision, the burden

20   of persuasion rests with the party challenging the ALJ's decision[.]").

21       "In matters alleging a procedural violation, a hearing officer may find that a child did not

22   receive a free appropriate public education only if the procedural inadequacies (I) impeded the

23   child's right to a free appropriate public education; (II) significantly impeded the parents'

24   opportunity to participate in the decision making process regarding the provision of a free

25   appropriate public education to the parents' child; or (III) caused a deprivation of educational

26   benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also R.B., ex rel. F.B. v. Napa Valley Unified School*

27   *Dist.,* 496 F.3d 932, 937 (9th Cir.2007) (quoting *W.G. v. Bd. of Trustees of Target Range Sch. Dist.*

28   *No. 23,* 960 F.2d 1479, 1484 (9th Cir. 1992), *superseded by statute as stated in D.O. By and*

1   *Through Walker v. Escondido Union School District*, 59 F.4th 394,  409 (9th Cir. 2023)) ("A child

2   is denied a FAPE only when the procedural violation result[s] in the loss of educational opportunity

3   or seriously infringe[s] the parents' opportunity to participate in the IEP formation process.").

4   Review of an administrative record is generally limited to the record before the administrative

5   body.  *Wartenberg,* 59 F.3d at 891.  The district court must affirm if in its independent judgment, a

6   preponderance of the evidence supports the hearing officer's findings and conclusions.  *Id.* at 892.

## V.      ANALYSIS

8       Student alleges the ALJ erred and abused her discretion in deciding Issues 2 and 3 above

9   because: (1) she did not carefully and impartially consider all the evidence; (2) she did not consider

10   and addressed evidence supporting Student's position: and (3) she did not conduct the hearing and

11   base her decision on the controlling law and rules.  (Doc. 1 at 9.)  District denies Student's

12   allegations.  (Doc. 21 at 4.)

### A.      IDEA Statutory Framework

14       Congress enacted the IDEA "to ensure that all children with disabilities have available to

15   them a free appropriate public education that emphasizes special education and related services

16   designed to meet their unique needs and prepare them for further education...."  20 U.S.C. §

17   1400(d)(1)(A); *L.M.,* 556 F.3d at 909. The IDEA provides federal funds to help state and local

18   agencies educate children with disabilities while conditioning the funds on compliance with

19   specific goals and procedures. 20 U.S.C. § 1412; *Rowley,*  458 U.S. at 179-80 (describing the origin

20   and primary provisions of IDEA); *Hoeft v. Tucson Unified Sch. Dist.,* 967 F.2d 1298, 1300 (9th Cir.

21   1992) ("Federal funding is conditioned upon state compliance with the IDEA's extensive

22   substantive and procedural requirements.")

23       A FAPE is defined as "special education and related services that … are provided in

24   conformity with the [IEP] required under section 1414(d)" of the IDEA.  20 U.S.C. § 1401(9).

25   "Parents participate along with teachers and school district representatives in the process of

26   determining what constitutes a 'free appropriate education' for each disabled child."  *Hoeft,* 967

27   F.2d at 1300. The IEP is the "centerpiece" of IDEA's "education delivery system" for children with

28   disabilities.  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  An IEP is a written statement for each child

10

that is developed, reviewed, and revised annually.  20 U.S.C. § 1414 (d)(1)(A)(i).  The IEP must include (1) a statement of the child's present levels of academic achievement and functional performance; (2) a statement of measurable annual goals, including academic and functional goals; (3) a description of how the child's progress toward meeting the annual goals will be measured; (4) a statement of the special education and related services to be provided to the child; (5) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class; (6) the projected date for the beginning of services and modifications; and (7) the anticipated frequency, location, and duration of the services and modifications.  *Id.*

In *Rowley*, the Supreme Court held that a school district complies with the IDEA if the school district (1) complies with the statute's procedures, and (2) develops an IEP reasonably calculated to enable the child to receive educational benefits.  458 U.S. at 206-07 (construing the Education for All Handicapped Children Act, IDEA's precursor); *see also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 399 (2017) ("To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.").  "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.*"  Rowley*, 458 U.S. at 207.  The reviewing court evaluates the IEP for objective reasonableness in light of information available at the time it was drafted.  *Adams*, 195 F.3d at 1149.  An IEP is not evaluated on hindsight, but rather as a "snapshot" of the circumstances at the time the IEP was drafted.  *Id.* The court focuses primarily on the school district's proposed placement and whether it is reasonably calculated to provide the student with educational benefits, and not on alternatives the parents may have preferred.  *Gregory K.*, 811 F.2d at 1314.

**B.     Deference**

District courts apply a modified *de novo* standard of review to the appropriateness of a special education placement under the IDEA.  *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1108-09 (9th Cir. 2009).  While "less deference than is conventional in the review of agency decisions" is afforded to an IDEA administrative decisions, *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988), "courts must give due weight to judgments of education policy." *Ojai*

*Unified Sch. Dist.*, 4 F.3d at 1472 (quoting *Gregory K.*, 811 F.2d at 1311).  "The court, in

recognition of the expertise of the administrative agency, must consider the findings carefully and

endeavor to respond to the hearing officer's resolution of each material issue."  *Gregory K.*, 811

F.2d at 1311 (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984),

*aff'd*, 471 U.S. 359 (1985)).  When applying the modified *de novo* standard, the court assigns

deference to the administrative decision when it is careful, thorough, impartial, and sensitive to the

complexities of the case.  *Cnty. Of San Diego v. Cal. Special Educ. Hearing Office* [*San Diego*], 93

F.3d 1458, 1466-67 (9th Cir. 1996); *Ojai*, 4 F.3d at 1476.  A court may "treat a hearing officer's

findings as thorough and careful when the officer participates in the questioning of witnesses and

writes a decision containing a complete factual background as well as a discrete analysis supporting

the ultimate conclusions."  *R.B.,* 496 F.3d at 942.  "After consideration, the court is free to accept or

reject the findings in part or in whole."  *Gregory K.*, 811 F.32 at 1311.  Though a court has

"discretion to reject the administrative findings after carefully considering them, [a court is] not

permitted simply to ignore the administrative findings."  *San Diego*, 93 F.3d at 1466.  "A court

reviews findings of fact for clear error, even if those findings are based on the administrative

record."  *R.B.*, 496 F.3d at 937.

Student asserts the ALJ's decision should not be accorded deference because it is not based

upon careful and impartial consideration of all the evidence and the laws and rules in IDEA and the

state's education code.  (Doc. 1 at 9; Doc. 30 at 12.)  He argues that the ALJ abused her discretion

by failing to conduct the hearing in the manner required by law, and by making inappropriate

rulings.  Particularly, Student argues the ALJ was arbitrary and capricious by failing to address and

consider evidence that supported his position.  For example, he asserts the ALJ inappropriately

discounted the testimony of his special education behavioral expert, Dr. Jeffrey Hayden, based

upon Hayden's perceived lack of personal experience with Student relative to the District's

witnesses.  (Doc. 30 at 9.)  Student also asserts the ALJ's failure to make credibility determinations,

especially as to Hayden, militates against deference.  (Doc. 32 at 6, 7; *see also* Doc. 32 at 9.)

The Court finds the ALJ's findings of fact and determinations regarding credibility and

weight of evidence to be thorough, careful, impartial, and reliable, and entitled to deference.

(Doc,. 28-5 at 233-300.)  As discussed more fully in the succeeding sections, the ALJ presided over a hearing lasting a total of thirteen days spread over nearly a month.  (Doc. 28-5 at 234.)    The ALJ heard testimony from twenty witnesses and admitted and considered nearly one hundred exhibits.  (Doc. 28-6 at 1-2889.)  The ALJ actively and fully managed and participated in the hearing, engaging counsel and witnesses, asking questions, and ruling evidentiary issues as they arose.  (*Id.*)

The ALJ issued  a reasoned sixty-eight page decision that cited the appropriate legal standards, identified burdens of proof, carefully and thoroughly considered and weighed the evidence, and explained her findings and conclusions with well supported factual findings and complete, well-reasoned, and thoughtful analysis.  (Doc. 28-5 at 233-300, citing 20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 *et seq*.; Educ. Code, § 56000 *et seq*.; Cal. Code Regs., tit. 5, § 3000 *et seq*.); *see also R.B.*, 496 F.3d at 942 ("We treat a hearing officer's findings as "thorough and careful" when the officer participates in the questioning of witnesses and writes a decision "contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions."). Therefore, the Court affords substantial deference to the ALJ's findings and conclusions.[5]

## C.    Issue 2

The ALJ ruled that the District's February 2020 FBA was appropriate such that it need not fund an IEE.  (Doc. 28-5 at 296.)

### 1.    Timeliness of District's June 26, 2020 Due Process Complaint

Student asserts the ALJ erred in finding the District's June 26, 2020 due process complaint was timely filed.  He asserts the District unnecessarily delayed more than 108 days in filing its due process complaint following Mother's March 11, 2020 request for an FBA IEE, and that the ALJ erred in finding otherwise.  (*See* Doc, 28-2 at 274-76 citing 34 C.F.R. § 300.502(b)(2)(i-ii).) However, the ALJ was reasonable in agreeing with the District, that there was no unnecessary delay because: (1) the district engaged in good faith efforts following its [April 21, 2020 public written notice denying the request] to determine whether Mother would withdraw the request; and, (2)

---

[5] The ALJ's factual statements in her decision constitute the written findings of fact required by the IDEA and state law.  (Doc. 28-5 at 236 citing 20 U.S.C. § 1415(h)(4); Educ. Code, § 56505(e)(5).)

1  filed its the due process complaint within three weeks of reaching impasse with Mother and her

2  advocate, Ms. Foster.  (Doc. 28-2 at 252; Doc. 28-5 at 24-31, 211.)

3      There is no dispute between the parties that "[i]f a parent requests an independent

4  educational evaluation at public expense, the public agency must, without unnecessary delay, either

5  (i) [f]ile a due process complaint to request a hearing to show that its evaluation is appropriate; or

6  (ii) [e]nsure that an independent educational evaluation is provided at public expense. . . ."  34

7  C.F.R. § 300.502(b)(2)(i-ii).

8      The ALJ reasonably rejected Student's contention the District's due process filing was

9  untimely and thus a waiver of the right to file for due process, finding the District filed its June 26th

10  due process complaint without "unnecessary delay."  (Doc. 28-5 at 262-63 citing 34 C.F.R. §

11  300.502(b)(2); Educ. Code, § 56329(c).)  The ALJ observed the term "unnecessary delay,"

12  undefined in the regulations, can accommodate the relatively brief (i.e., 3 month and two week)

13  period of good faith negotiation and communication regarding potential withdrawal of Student's

14  request which took place here between the District's Assistant Director of Special Education,

15  Rebecca Ruiz, Mother, and Student's advocate Beverly Foster on at least four occasions noted by

16  the ALR, until impasse was reached on or about June 10, 2020.  (Doc. 28-5 at 263-65, citing Letter

17  to Anonymous, 56 IDELR 175 (OSEP 2010).)  The ALJ cited to caselaw where a comparable delay

18  during negotiations until impasse was not found to be "unnecessarily long."  (Doc. 28-5 at 263

19  citing *J.P. v. Ripon Unified School District*, 2009 WL 1034993 (E.D. Cal. April 15, 2009.)  The

20  ALJ observed that the district is allowed reasonably flexibility, i.e., a brief period of time for good

21  faith discussions and negotiations between the parties, based upon the specific facts presented.

22  (Doc. 28-5 at 263 citing 34 C.F.R. § 300.502(b)(2); *J.P.*, 2009 WL 1034993 (E.D. Cal. April 15,

23  2009); *Pajaro Valley Unified School District v. J.S.*, 2006  WL 3734289 (N.D. Cal. Dec. 15,

24  2006).)

25      A school district must comply both procedurally and substantively with the IDEA.  *M.M. v.*

26  *Lafayette Sch. Dist.*, 767 F.3d 842, 852 (9th Cir. 2014), *as amended* (Oct. 1, 2014).  Unnecessary

27  delay as that term is used in 34 C.F.R. § 300.502(b)(2) presents a "fact-specific inquiry" that

28  focuses on the circumstances  surrounding the delay.  *L.C. by & through Cruz v. Alta Loma Sch.*

1  *Dist.*, 849 F. App'x 678, 679 (9th Cir. 2021) (citing *C.W. v. Capistrano Unified Sch. Dist.*, 784 F.3d

2  1237, 1247 (9th Cir. 2015), and *J.P.,* 2009 WL 1034993 at *7 (E.D. Cal. Apr. 15, 2009)).[6]  "When

3  parties continued to discuss provision of an IEE, there was no unnecessary delay in the school

4  district waiting to file for a due process hearing until the parties reached a final impasse."  *Id.*

5        The evidence and testimony before the ALJ preponderates in support of her findings and

6  conclusion in this regard.  The Court observes Ruiz's uncontroverted testimony that: (i) the District

7  issued an April 21, 2020 prior written notice denying Mother's March 10, 2020 request for FBA

8  IEE, including an explanation and request that Mother advise District by May 8, 2020, if she

9  wished to withdraw the request; (ii) the District, not hearing from Mother, and in collaboration with

10  her advocate, Ms. Foster, requested a response by June 12, 2020; (iii) on June 10,  2020, Foster

11  advised Ruiz that Mother would stand by her request for an FBA IEE (Doc. 28-5 at 211); and, (iv)

12  on June 26, 2020, the District filed for due process on that issue.  (Doc. 28-6 at  2860-65; *see also*

13  Doc. 28-5 at 22-31, 233.)

14        Moreover, the record supports the ALJ's finding that the District's April 21, 2020 prior

15  written notice to Student of its decision not to fund the requested FBA IEE was sufficient as an

16  explanation and given within a reasonable time following Student's March 10, 2020 request.  (Doc.

17  28-5 at 22-28, 263-64 citing 34 C.F.R. § 300.503.)  The District's April 21, 2020 prior written

18  notice was issued less than one month following its receipt of Mother's March 10, 2020 request;

19  explained the District's decision on the facts of the matter and legal requirements; and provided the

20  requisite procedural protections.  (*Id.*)

21        **2.**    **Appropriateness of District's February 28, 2020 FBA**

22        Student asserts the ALJ erred in finding Hunt's February 28, 2020 FBA appropriate.

23  Student asserts the FBA lacked the data and analysis necessary to address his physical aggression

24  and failed to consider the testimony of his behavioral expert, Dr. Jeffrey Hayden.  (Doc. 30 at 13-

25  21; Doc. 32 at 6-9.)   Particularly, he asserts the FBA (1) relied upon insufficient quantitative data,

26  (2) failed to support "access" as the function of Student's maladaptive behaviors, and (3) relied

27

28  ───────────────
[6] See Fed. Rule of Appellate Procedure 32.1, generally governing citation of unpublished judicial decisions issued on or after Jan. 1, 2007; *see also* U.S. Ct. of App. 9th Cir. Rule 36-3.

1   upon the  invalid behavioral hypothesis (i.e. "access") to support FERB and behavioral goals.  (*Id.*)

2   However, the Court accords substantial deference to the ALJ's findings of fact and determinations

3   regarding credibility and weight of the evidence, and finds preponderant evidence supports the

4   ALJ's ruling that under controlling federal and state authority, the FBA was a thorough and reliable

5   assessment and Student is not entitled to an IEE for an FBA at Public Expense, as discussed

6   below.[7]

7          First, Student argues the FBA included extraneous quantitative data, failed to derive the

8   most significant data point, "rates of behavior," i.e., number of incidents over fixed period, in order

9   to identify special education and related needs; and improperly relied upon "frequency of behavior"

10  per observation as a substitute for "rates of behavior."  (Doc. 30 at 19-20.)  Student primarily relies

11  upon the testimony and opinions of his special education behavioral expert, Dr. Jeffrey Hayden.

12  Hayden, a BCBA with over ten years' experience, testified to his credentials, his review of

13  Student's records, and his interviews with Mother, Student's grandmother, Sharon Anderson, and

14  Student.  (Doc. 28-6 at 2135-51.)  Hayden testified to the required content of a functional behavior

15  assessment including: history, data collection, defining the behavior including frequency and rate of

16  behavior, use of an antecedents, behaviors, consequences ("ABC") chart, and a behavioral

17  hypothesis and recommendations for intervention.  (*Id.* at 2152-62.)  Hayden critiqued the February

18  28, 2020 FBA as not thorough and reliable, on grounds it contained too much detail; it lacked the

19  quantitative data and calculations required by BCBA standards to support its "most likely"

20  probability findings for the hypothesis of behavior; and it relied upon "frequency" of target

21  behavior rather than "rate" of target behavior.

22         The ALJ reasonably found that Student did not prove the FBA was substantively deficient.

23  (Doc. 28-5 at 265, 269.)  The ALJ, considered IDEA's standards for student assessments and

24  related state law requirements applicable to assessment of individuals for special education.  (Doc.

25  28-5 at 238-39 citing 20 U.S.C. § 1414(b)(2)(A)(B))(C),(3)(A)(B); 34 C.F.R. §

26  300.304(b)(2)(3),(c)(4)(6); Educ. Code, §§ 56320)(a)(b)(e)(f)(g); 56322; *Vasheresse v. Laguna*

27  *Salada Union School District* (N.D. Cal. 2001) 211 F.Supp.2d 1150, 1157-1158) (hearing officer

---

28  [7] Any findings of fact that are deemed to be conclusions of law are incorporated as such.

did not err by considering the testimony of all witnesses and making a reasonable judgment based thereon and student's educational records). The ALJ considered evidence in the record regarding Hunt's qualifications and BCBA-Master's level degree in school psychology, and found her qualified to conduct the assessment. (Doc. 28-5 at 265.) The ALJ also considered the qualifications and experience of Student's expert, Hayden, his BCBA-PhD level degree, and his testimony opining that an FBA should include certain standard components including the history of the behavior and surrounding circumstances, the frequency over time (rate) of the target behavior, and a functional equivalent replacement behavior ("FERB"). (*Id.* at 266.)

The ALJ reasonably relied upon evidence in the record that Hunt's FBA met federal, state, and even Hayden's standards. (*Id.* at 266.) The ALJ found that:

> [The FBA] contained a records review, including an educational history and history of Student's problem behavior and interventions. Hunt interviewed Student's teacher and Grandmother, and had other staff interview Mother. Hunt observed Student on five different days over a three-week period. She conducted an environmental analysis and collected data regarding what she observed.
>
> Hunt correctly identified Student's problem behavior as physical aggression and succinctly defined it as hitting with closed or open fist, kicking, throwing items, pushing, biting, headbutting and stomping on others' feet. Hunt determined this was the target
>
> behavior based on her records review and interviews. Hunt's data collection over five separate days included the frequency, intensity, duration, and the antecedents, behavior, and consequences, or "ABC" data of the target behaviors. Hunt hypothesized that the function of the target behavior was access to a preferred item, activity or person. "Access" referred to the function of obtaining a preferred item or activity or person, or
>
> to gain attention. "Escape" referred to the function of avoiding or escaping something aversive. There can also be automatic functions such as self-stimulation, where the function is simply that the activity feels good.
>
> Hunt developed a FERB recommending that Student would ask or choose to engage in an alternative independent academic task to gain access to the preferred activity or item. Hunt also developed three behavior goals. Hunt's written report also included recommendations.

(Doc. 28-5 at 267.)

Rejecting as unpersuasive Hayden's assertions to the contrary, the ALJ found that Hunt's FBA gathered appropriate and sufficient quantitative data points including frequency of target

behavior over time, generated a chart summarizing the ABC data, , and based thereon appropriately hypothesized the target behavior's function, i.e. "access to an item, activity or person." (Doc. 28-5 at 268.) The ALJ observed Hayden's acknowledgement during testimony that Hunt's FBA did include sufficient information gathered over five days of incidents including quantitative date of discrete events sufficient to support as hypothesized function of behavior. (Doc. 28-5 at 253-55) The ALJ observed Hayden's concession that there is no required format, but the FBA should include the history of the targeted behavior and collect data regarding antecedents and consequences, a hypothesized function of the behavior, a frequency of the behavior per unit of time (i.e. a rate), and a FERB. (Doc. 28-5 at 266-69.)

The administrative record reflects that Hunt's FBA details the data and information collected by Hunt and other assessors including through review of Student's academic and disciplinary records, observations of Student in various environments, and interviews with Mother, teacher, and District staff. The FBA analyzes the data from discrete events for antecedents, behavior, and consequences, and based thereon offers a hypothesis for the function of the behavior, a FERB and desired replacement behavior ("DRB"), and a BIP. (Doc. 28-4 at 146-75.) The FBA includes the following data, information, analysis, and reporting:

> Student's records relating to Student's educational and medical background including diagnosed ADHD and DMDD, the target behavior, and disciplinary history including 19 major and 6 minor referrals most of which were for physical aggression and defiance and 2 of which events necessitated evacuation of the classroom, and previous and current interventions;
>
> Interviews with first grade teacher Rodriguez, Mother, Grandmother, and Student interviews;
>
> Observations of Student including 6.5 hours on five different days over a three-week period;
>
> An environmental analysis and discussion regarding the school environment and behavior management during the school day including incentives, corrections, and removal from the classroom when behavior escalates, and that multiple staff members often required to keep Student and others safe from his physical aggression;
>
> Observation data including rating scales, frequency, intensity, duration, and ABC's of the problem behavior collected by staff during not less than 11 school days in December 2019, and 5 school days in February by Hunt herself;

The Tier 2 Behavior Support Plan ("BSP") agreed to on February 12, 2020;

Identification of the problem (target) behavior as physical aggression defined as hitting with closed/open fist, kicking, throwing items, pushing, biting, headbutting and stomping on others' feet, which at times required that he be put in restraint, with elopement and inappropriate behaviors such as shouting out, crawling/laying/jumping on carpet, touching peers and making inappropriate comments being precursors to the physically aggressive behaviors;

The hypothesized function of the target behavior as access to a preferred item/activity/person;

The FERB recommendation (that Student would ask or choose to engage in an alternative assignment or task in order to gain access to the preferred activity/item), and DRB" (that Student would complete academic tasks and that during instruction he would remain in a designated area, engage in the activity as directed, and keep hands and feet to himself); and

Three behavior goals designed to increase FERB and DRB and reduce the target behavior, and the BIP which drew upon the December 2019 IEP meeting and psycho-educational report for context.

(Doc. 28-4 at 146-75.) The administrative record includes the various reports, tests, and assessments that underlie the foregoing FBA contents, as well as prior assessments and the Section 504 assessment.  (*See* Docs. 28-3 at 4-303; 28-4 at 1-144, 187-303; Doc. 28-5 at 1-20.)

Hunt testified in detail in support of the FBA and its above noted contents, including as to her experience with Student; the purpose of her functional behavior assessment and its content; her review of Student's records including disciplinary and academic, and Student's prior assessments and IEP meetings; her data gathering and that of her fellow assessors, including observation of Student, interviews with Mother, Grandmother, first grade teacher Rodriguez, and Student; testing and assessment of Student pursuant to producer instructions, protocols, and validation requirements consistent with federal and state authorities; prior interventions with Student including under the "check-in / check-out" process and the Tier 2 Plan; and her data analysis, ABC chart, the target (maladaptive) behaviors, the functional behavior hypothesis, and her derivation of FERB, DRB, the BIP; and her behavioral goals and recommendations.  (*See* Doc. 28-6 at 405-68, 480, 495-97, 539-691, 754-56, 761-839.)  Also, the testimony of District staff in support of the other assessments presented at the February 28, 2020 IEP meeting, and the assessments themselves, support the FBA.

19

1   (*See* subsection "D," *post*.)

2       Next, Student argues the FBA did not support its hypothesis that "access"  was the function

3   of Student's target maladaptive behavior.  (Doc. 30 at 18.)  He asserts the FBA including its ABC

4   data spread and chart does not explain or provide a consistent methodology as to how or why

5   "access" and not "escape" is the hypothesized function of behavior for Student.  (Doc. 30 at 14, 16

6   citing Doc. 29, *Student v. Templeton Unified Sch. Dist.* (2017) OAH Case #2017051280, **24, 27.)

7   For example, he suggests Hunt failed to address District psychologist Elrod's December 19, 2019

8   finding in her psycho-educational report, that "escape" was the primary function of Student's target

9   behavior.  (*See* Doc. 30 at 16-18; Doc. 32 at 7-8.)  He asserts the ALJ's failure to address the pre-

10  existing data supporting Elrod's report undermines the FBA.  (Doc. 30 at 16-18.)

11      Student again points to Hayden, who opined that the FBA's hypothesized function of

12  behavior, i.e., "access," was unsupported by Hunt's data and ABC chart.  (*Id.* at 2145-46, 2165-84.)

13  Hayden opined that based on Hunt's data, "escape" was the most probable function of behavior.

14  (*Id.* at 2184-88.) But the ALJ reasonably found Hunt's hypothesized function of Student's behavior

15  (i.e., access) was based on her ABC data and adequately hypothesized a behavior function based

16  upon data points' analysis, to which she credibly testified.  Particularly, as the ALJ observed,  rates

17  of behavior, though not a legal requirements, were in fact reflected in or derivable from Hunt's

18  ABC chart which shows the number of behaviors over a fixed period of time.  (Doc. 28-5 at 266-

19  68.) The ALJ reasonably found that Student did not prove the FBA was substantively deficient.

20  (Doc. 28-5 at 265, 269.)  The ALJ, considered IDEA's standards for student assessments and

21  related state law requirements applicable to assessment of individuals for special education.  (Doc.

22  28-5 at 238-39 citing 20 U.S.C. § 1414(b)(2)(A)(B))(C),(3)(A)(B), 34 C.F.R. §

23  300.304(b)(2)(3),(c)(4)(6), Educ. Code, §§ 56320)(a)(b)(e)(f)(g), 56322.)

24      The ALJ considered school psychologist Elrod's December 19, 2019 assessment that

25  "escape" was the function of Student's behaviors, and reasonably found Elrod's assessment to be

26  inappropriate and inadequate in assessing Student's target maladaptive behaviors, discounting its

27  weight relative to Hunt's FBA. (Doc. 28-5 at 253-55.)  As noted, the ALJ reasonably relied upon

28  evidence in the record that Hunt's FBA met federal, state, and Hayden's standards (*id*. at 266), and

that "Hunt correctly identified Student's problem [target] behavior as physical aggression . . .  Hunt hypothesized that the function of the target behavior was access to a preferred item, activity or person . . ." (Doc. 28-5 at 267.)  The ALJ observed Hayden's testimony that although he opined "escape" as the function of behavior, there was room for disagreement, and that some item he labeled as "escape" could also be interpreted as "access."  (Doc. 28-5 at 266-69.)

Regarding Hunt's hypothesis that "access" to a preferred item such as the Chromebook was the function of Student's target behaviors, Hunt in her FBA acknowledged Elrod's December 19, 2019 psycho-educational assessment that Student's main escape behavior (to escape work or demands he does not want to follow through with) is getting on his Chromebook.  (Doc. 28-4 at 150.)  Still, Hunt's "access" hypothesis (*see* Doc. 28-4 at 173) finds support in the preponderant evidence in the administrative record, including Hunt's ABC data chart, for the reasons stated and those that follow.  For example, the FBA notes an interview with first grade teacher Rodriguez who stated that Student mostly engages in aggressive target behaviors when he is denied access to a preferred item or activity, such as his Chromebook.  (Doc. 28-4 at 151.)  Notably, Rodriguez testified that Student was triggered by being denied an activity or to avoid having to complete an activity [i.e. access and escape].  (Doc. 28-6 at 912-13.)

Next, Student argues that Hunt's derived FERB and behavioral goals were inappropriate because they relied upon the improper hypothesis that "access" was the function Student's target maladaptive behaviors.  (Doc. 30 at 19-20.)  He argues "ample reason to conclude, like Ms. Elrod and [his expert] Dr. Hayden, that escape was the function of [Student's]  behavior."  (*Id.*)  He argues the FERB was necessarily ineffective to the extent it targets the wrong behavior.  (*Id.*)  Based on his above noted opinion that "escape" was the function of Student's maladaptive behavior, Hayden further opined Hunt's FERB, behavioral goals, and even her BIP were inappropriate, devoid of quantitative support, not achievable, and insufficient to reduce Student's aggressive behavior.  (*Id.* at 2191-2208.)

Here again, the ALJ reasonably found that Student did not prove the FBA was substantively deficient.  (Doc. 28-5 at 265, 269.)  The ALJ, considered IDEA's standards for student assessments and related state law requirements applicable to assessment of individuals for special education.

1    (Doc. 28-5 at 238-39 citing 20 U.S.C. § 1414(b)(2)(A)(B))(C),(3)(A)(B), 34 C.F.R. §

2    300.304(b)(2)(3),(c)(4)(6), Educ. Code, §§ 56320)(a)(b)(e)(f)(g), 56322.) As noted, the ALJ

3    reasonably relied upon evidence in the record that Hunt's FBA met federal, state, and Hayden's

4    standards (*id.* at 266), observing that "Hunt developed a FERB recommending that Student would

5    ask or choose to engage in an alternative independent academic task to gain access to the preferred

6    activity or item. Hunt also developed three behavior goals. Hunt's written report also included

7    recommendations." (Doc. 28-5 at 267.)  Significantly, in rejecting as unpersuasive Hayden's

8    opinion that Hunt's "FERB was not a FERB," the ALJ reasonably founds that Hunt's FERB "was

9    directed toward an alternate means "in order to gain access to an item or activity[,]" and thus "met

10   the definition of a FERB that Hayden himself laid out." (Doc. 28-5 at 269.)

11        The administrative record reflects Hunt's testimony regarding her methodology and

12   calculation of frequency of behaviors per observation and its relationship to behavioral goal

13   measurement. (*Id.* at 607-13.)  Ruiz put this in context, testifying that the FERB could be seen as

14   baby steps toward the DRB over the covered annual term. (*Id.* at 2848-54.)  Hunt also testified to

15   her experience working with students placed in the District's BIC who, like Student, have social,

16   emotional and behavioral needs not able to be minimized in the general education setting; and that

17   the BIC has a lower student to teacher ratio and a higher behavioral aide to student ratio. (*Id.* at

18   590-92.)  Significantly, Hunt testified that even with multiple behavior aides in the classroom,

19   Student's maladaptive behaviors were still occurring. (*Id.* at 821.)

20        Hunt's FERB, that in order to gain access to an item./activity Student will ask or chose to

21   engage in alternative independent academic tasks, and her DRB, that during academic instruction

22   and tasks Student will remain in a designated area, engaging in an activity as directed, and keep his

23   hands and feet to himself - also find support the ABC data and the noted testimony of  Hunt and

24   other District witnesses and assessors, discussed more fully below.  The same goes for Hunt's

25   FERB, DRB, and physical aggression goals, which include specified levels of proficiency as

26   measured by teacher/staff recorded data. (Doc. 28-4 at 174; *see also* subsection "D," *post*.) To the

27   extent Hunt, during her testimony, could not point to the baseline data in the FBA for her DRB, she

28   testified that her baseline data was collected, but was missing from the FBA report that was

1  admitted at the hearing.  (*See* Doc. 28-6 at 588, 805-08.)  The ALJ reasonably could find Student's

2  present level of academic and functional performance and measurable goals predicated thereon

3  were reflected in the assessments and evaluations and related data included in the FBA.  (*See* Doc

4  28-4 at 146-175); 34 C.F.R. § 300.320(a). Moreover, the ALJ found the BIP, included in the FBA,

5  "gave detailed instructions to teachers and staff as to how to . . . state desired behaviors and

6  expectations . . . consistent with the [FBA] which as discussed above, was appropriately

7  conducted."  (Doc. 28-5 at 294.)  These desired behaviors and expectations necessarily are

8  informed by baseline FBA and BIP datapoints of present functionality and behavior.  (*See* Doc. 28-

9  4 at 146-175.)

10         The Court also observes that Hunt's testimony indicates that having additional aides in the

11  general education classroom seemed to increase the target behavior because it placed more

12  demands on Student, providing further support for recommendation of the special day BIC and the

13  BIP.  (*See* Doc. 26-6 at 580.)  Hunt testified that general education was not the appropriate setting

14  because it presented too many opportunities for the target behavior and too few staff to correct

15  behavior.  (*Id.* at 592-93.)

16         Finally, the ALJ reasonably found that Hayden's testimony generally lacked persuasive

17  weight.  For example, Hayden during his testimony conceded that: (i) his interview with Mother,

18  Grandmother, and Student lasted only 30-45 minutes, (ii) in preparing his opinions, he did not reach

19  out to Student's teachers or to District assessors Hunt, Elrod or Morris, (iii) the rate of behavior

20  metric and underlying quantitative data which he opined was missing from the FBA, could be

21  derived from data and information within in the FBA and its ABC chart, (iv) he had no reason to

22  doubt the accuracy of the information in the FBA, (v) the behaviors which he labeled as "escape"

23  also could be labeled "access," as there is room for disagreement regarding labeling incidents in

24  terms of function of behavior, and (vi) the FBA's behavior intervention plan strategies could be

25  appropriate, and its behavioral goals could be achievable within the applicable one year term of the

26  FBA.  (*See* Doc. 28-6 at 2209-44.)

27         The ALJ reasonably concluded that "Hayden's opinions did not carry enough weight to

28  establish that Panama's behavioral assessment was so procedurally deficient that it resulted in a

1  denial of a FAPE.  Panama met its burden that its behavior assessment was appropriate."  (Doc. 28-

2  5 at 269.)  The administrative record does not compel the conclusion that the ALJ clearly erred by

3  affording little weight to the testimony of Hayden.  *See Amanda J.*, 267 F.3d at 889.

4  **D.      Issue 3**

5         The ALJ ruled that the District's IEP offer dated December 19, 2019 as amended February

6  28, 2020 was necessary to provide Student a FAPE in the LRE such that it may be implemented

7  without parental consent.  (Doc. 28-5 at 296.)

8         **1.      Timeliness of District's October 20, 2020 Due Process Complaint**

9         District asserted at the hearing that its February 28, 2020 Amended IEP ("Amended IEP")

10 was procedurally complaint with IDEA.  *(See* Doc. 28-5 at 269.) Student asserts the ALJ erred by

11 finding the District's October 20, 2020 due process complaint to be timely.  Particularly, Student

12 asserts that District did not initiate its October 2020 due process complaint "expeditiously" as

13 required under state law.  (Doc. 30 at 12, 27, citing Educ. Code § 56346(f), *I.R. ex rel. E.N. v. Los*

14 *Angeles Unified Sch. Dist.*, 805 F3d. 1164, 1169 (9th Cir. 2015). The ALJ found that:

15         Student also contends that Panama's October 20, 2020 due process filing
          on this issue was untimely and that the delay renders Issue 3 "moot."
16
17         Preliminarily, Student's mootness argument is not persuasive.  Panama
          filed its October 20, 2020 complaint approximately eight months after
          making the February 28, 2020 IEP offer. Student cites no law that would
18         disable Panama from seeking an order that that IEP offer was necessary
          to provide Student a FAPE. Student relies on I.R. v. Los Angeles
19         Unified School District (9th Cir. 2015) 805 F.3d 1164,1169 (I.R) in
          support of the mootness claim, but that case is inapposite. First, the
20         delay in I.R. was double that at issue here. In I.R., there was more than a
          year and a half delay in requesting a due process hearing following that
21         mother's failure to consent to the provision of special education and
          related services. In contrast, here, there was only a delay of about eight
22         months. Second, the holding in I.R. was not that the filing delay
          rendered Los Angeles' case "moot." Rather, I.R. held that Student had a
23         cause of action to seek remedies for the denial of FAPE caused by a
          school district's filing delay. Here, Student did not raise such a claim.
24

25 (Doc. 28-5 at 270.) The IDEA provides the following timeline for requesting a due process hearing:

26         A parent or agency shall request an impartial due process hearing within
          2 years of the date the parent or agency knew or should have known
27         about the alleged action that forms the basis of the complaint, or, if the
          State has an explicit time limitation for requesting such a hearing under
28         this subchapter, in such time as the State law allows.

20 U.S.C.A. § 1415(f)(3)(C).  The Ninth Circuit in *I.R.* found that Education Code Section 56346 provided such a state law timeline.  The court in *I.R.* stated that "[i]n evaluating how long is too long for a school district to take in determining a component's necessity and initiating a due process hearing, we recognize that the school district must have some flexibility to allow for due consideration of the parents' reasons for withholding consent to an IEP component[,]" and that "a school district should be able to consider the parents' position and make a determination as to a disputed component's necessity within a reasonable period of time."  805 F.3d at 1169.  The *I.R.* Court went on to state that "[t]he obvious point of § 56346(f) is to minimize the duration of the denial of a FAPE by requiring the school district, if it cannot reach agreement with the child's parents, to initiate the process to adjudicate the dispute.  *Id.* at 1170.

The ALJ considered *I.R.* and reasonably distinguished that case on its facts and circumstances, finding the District's delay here was half of that found to be unreasonable in *I.R.* The ALJ reasonably found that Student failed to show the October 20, 2020 due process claim was untimely under any law.  Notably, the ALJ was aware the District filed for due process on Student's FBA IEE request on June 26, 2020, and that the District's underlying FBA was a component of the Amended IEP, further distinguishing this case from the facts and circumstances before the *I.R.* Court, and supporting the ALJ's determination that unlike in *I.R.*, there was not unreasonable delay that left Student in inappropriate programing for a longer period.

Also, the ALJ reasonably found the *I.R.* Court did not reach the claim asserted here, that District's alleged delay in filing for due process rendered "moot" the issues raised thereby.  In *I.R.*, unlike here, the school district entirely failed to file for due process, relying instead on the student's due process filing 1.5 years after impasse on IEP placement. *See I.R.*, 805 F.3d at 1170.  The ALJ correctly observed the court in *I.R.* did not have occasion to reach and rule upon the contention raised by Student, whether the District's filing was untimely and thereupon "moot."

Additionally, the Court finds preponderant evidence in the record supporting the ALJ's findings and conclusions.  For example, the District's October 20, 2020 due process complaint details its efforts to reach agreement Student during the period of alleged delay, including that: (i) the District, in response to Student's September 9, 2020 due process complaint, issued a September

29, 2020 prior written notice denying Student's request for an S&L IEE, requesting therein that Student respond by October 9, 2020, and (ii) on October 15, 2020, the District gave notice to Student that absent agreement on the S&L IEE, it would file for due process to fully implement the Amended IEP without parental consent, requesting therein that Student respond with his consent by October 19, 2020, and advising that absent such consent, the District would be filing for due process on the IEP.  (*See* Doc. 28-1 at 165.)

### 2. Procedural Sufficiency of IEP Team Meetings

District observes Student's assertion that Mother was denied participation in the IEP process, and responds the ALJ correctly found that notice, parental participation, and member attendance at the December 19, 2019 and February 28, 2020 IEP team meetings were procedurally compliant.  (Doc. 31 at 16.)

The ALJ acknowledged IDEA's requirements for notice, parental participation, and member attendance at IEP team meetings including as to IEP evaluation, placement, and the provision of a FAPE.  (Doc. 28-5 at 284 citing 20 U.S.C. Sec. 1415(b)(3); 34 C.F.R. §§ 300.321(a), 300/322(a-c), 300.501(b); Educ. Code, § 56500.4);  *Smith*, 15 F.3d at 1526.  The ALJ reasonably observed evidence in the record that:

> The IEP team meetings met these procedural requirements for notice, participation and attendance. All required members attended the December 2019 and February 2020 IEP team meetings. All assessment reports were presented and discussed at the December 19, 2019 and February 28, 2020 IEP team meetings. Mother, and her advocate participated at the December 2019 and February 2020 IEP team meetings in a meaningful way. The denial of Mother's participatory rights that had occurred in the May and December IEP team meetings, by virtue of the lack of a behavioral assessment, was cured by the February 2020 functional behavior assessment. By February 28, 2020, Mother and the rest of the IEP team were provided with all of required information necessary to develop an appropriate program. Panama's assessors participated in the IEP meetings and offered their opinions. The IEP team considered, discussed, had the opportunity to disagree with, and or incorporate recommendations from all assessors. Panama complied with these procedural requirements.

(Doc. 28-5 at 285.)

The administrative record preponderates in support of the ALJ's finding that these requirements were satisfied in this case.  Particularly, Student has not made a showing on the

1   administrative record that procedural guidelines and requirements went unsatisfied or that Mother's

2   participation in the meetings was impeded by lack of adequate information and materials

3   underlying the February 28, 2020 Amended IEP.  (*See e.g.*, Doc. 28-3 at 205-303; Doc. 28-4 at 1-

4   303; Doc. 28-5 at 1-20; Doc. 28-6 at 1334-38; *see also* subsection "3," *post*.)

5       **3.    The District's Amended IEP as an Offer of a FAPE in the LRE**

6       Student asserts the ALJ erred in finding the Amended IEP was based upon adequate

7   assessments and goals; the Amended IEP was necessary to provide a FAPE in the LRE; and the

8   Amended IEP could be implemented without parental consent.  (Doc. 30 at 9-11, 21-29 citing 20

9   U.S.C. § 1414(d)(2)(A), (4)(A); 34 C.F.R. §§ 300.323(a), 300.324(b)(1), *Anchorage School Dist. v.*

10  *M.P.*, 689 F.3d. 1047, 1055 (9th Cir. 2012); Doc. 32 at 5-11.) However, as above, the Court accords

11  substantial deference to the ALJ's findings of fact and determinations regarding credibility and

12  weight of the evidence, and finds preponderant evidence supports the ALJ's ruling under

13  controlling federal and state authority that the Amended IEP was an offer of a FAPE in the LRE

14  such that it could be implemented without parental consent.[8]

15      The ALJ appropriately considered IDEA's standards for student assessments.  (Doc. 28-5 at

16  238-39 citing 20 U.S.C. § 1414(b)(2)(A)(B))(C),(3)(A)(B), 34 C.F.R. § 300.304(b)(2)(3),(c)(4)(6),

17  Educ. Code, §§ 56320)(a)(b)(e)(f)(g), 56322.) The ALJ set out the requirements for an IEP, that:

18      > An IEP should include a statement of the child's present levels of
19      > academic achievement and functional performance, including how the
        > child's disability affects the child's involvement and progress in the
20      > general education curriculum. It should include a statement of
        > measurable annual goals, including academic and functional goals,
21      > designed to meet the child's needs that result from the child's disability
        > to enable the child to be involved in and make progress in the general
22      > education curriculum, and meet each of the child's other educational
        > needs that result from the child's disability. (20 U.S.C. § 1414(d)(1)(A);
23      > 34 C.F.R. § 300.320.) An IEP must include a statement of the special
        > education and related services, based on peer-reviewed research to the
24      > extent practicable, that will be provided to the student. (20 U.S.C. §
        > 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4); Ed. Code, § 56345,
25      > subd. (a)(4).) The IEP must include a projected start date for services
        > and modifications, as well as the anticipated frequency, location, and
26      > duration    of    services    and    modifications.    (20    U.S.C.    §
        > 1414(d)(1)(A)(i)(VII); 34 C.F.R. § 300.320(a)(7); Ed. Code § 56345,
27      > subd. (a)(7).) The IEP need only include the information set forth in
        > Title 20 United States Code section 1414(d)(1)(A)(i), and the required

28  _____
    [8] Any findings of fact that are deemed to be conclusions of law are incorporated as such.

1

2

        information need only be set forth once. (20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R.

3

        § 300.320(d); Ed. Code § 56345, subds. (h) and (i).)

4

5

        In developing the IEP, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the child's education, the results of the most recent evaluations of the child, and the academic, developmental, and functional needs of the child. (20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. §§ 300.324 (a).)

6

7

8

        In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (See Gregory K. v. Longview School District (9th Cir. 1987) 811 F.2d 1307, 1314.) A school district is not

9

10

11

12

        required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student. (Ibid.) An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. (Adams v. State of Oregon (9th Cir. 1999) 195 F.3d 1141, 1149.) An IEP is "a snapshot, not a retrospective." (Ibid. [citing Fuhrmann v. East Hanover Board of Education, supra, 993 F.2d 1031, 1041].) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (Id.)

13

14

(Doc. 28-5 at 270-71.)

15

16

17

18

      The ALJ reasonably found the District carried its burden of proving that it followed "the procedures set forth in the IDEA," and that substantively the resultant Amended IEP was designed to meet Student's "unique needs, and reasonably calculated to enable [Student] to receive educational benefit."   (Doc. 28-5 at 270 citing *Rowley*, 458 U.S. at 206-207; *see also id.* at 295.)

19

20

21

22

23

24

The ALJ reasonably found that the December 19, 2019 IEP offer and the February 28, 2020 IEP offer, comprising the Amended IEP, were necessary to provide Student with a FAPE in the LRE. (Doc. 28-5 at 272.) First, in addition to the above discussed errors he ascribes to the FBA, Student asserts the other assessments included with the Amended IEP failed to adequately assess Student's eligibility for special education and related services.  These assessments are discussed individually below.

25

         ***a.***     ***Health, Academic, Cognitive, and Social-Emotional Assessments***

26

27

28

      The ALJ reasonably found the District's December 19, 2019 psycho-educational assessment appropriately assessed Student's health, academic, and cognitive functioning.  (Doc. 28-5 at 727-73.) The ALJ pointed to evidence in the record that:

1
2
School nurse, Valerie Hernandez, conducted a vision and hearing screening, administered according to the protocols. She submitted a health questionnaire to Mother and noted Student's

3
4
medical diagnoses of Attention Deficit Hyperactivity Disorder and oppositional defiance disorder. She reviewed prior assessments. Hernandez prepared a health care plan based on her evaluation.

5
6
7
8
9
School psychologist Elrod appropriately assessed Student's cognitive abilities. She used the Wechsler Intelligence Scale for Children, fifth edition to assess Student's cognitive abilities. Results revealed Student was of average intelligence. Elrod conducted, and had others conduct, observations of Student. She reviewed records, including Student's behavioral incidents during the 2018-19 and 2019-20 school year, outlined above. She interviewed Mother and Student, and re-interviewed first grade teacher Rodriguez, whom she had previously interviewed in October 2019.

10
11
12
Special education teacher Patricia Keene administered the December 2019 academic assessment, using the Woodcock-Johnson Tests of Achievement, fourth edition and the Dynamic Indicators of Basic Early Literacy Skills to assess for academic achievement. As part of the May 2019 assessment, Coleman had

13
14
15
16
17
previously assessed Student's academics using the Woodcock-Johnson, but nothing in the manual prohibited re-testing in February 2020. Keene gave Student the appropriate subtests in accordance with the manual's instructions. Student scored overall average or low average educational achievement in the areas of reading, math, written language, oral language, and academic skills. The cognitive and academic instruments were appropriate to their purpose, were appropriately administered and scored, and the results were valid and reliable.

18
19
20
21
22
23
As far as it went, Elrod's December 2019 assessment of Student's social-emotional functioning was appropriate. And, as discussed above in Issue 2, Panama's February 2020 behavior assessment was appropriate. It cured the sole defect in the December 2019 psycho-educational assessment, which except for failing to appropriately assess Student's behavior had appropriately assessed his cognition, academics and social-emotional functioning. And, correcting the error in judgment that had been made in the May 28, 2019 assessment, Panama appropriately determined in December 2019 that Student was eligible for special education and related services. Thus, by February 2020 Panama had appropriately assessed Student's psycho-educational and behavioral functioning.

24

25
26
(Doc. 28-5 at 272-73.) The evidence and testimony in the administrative record preponderates in support of the ALJ's findings and conclusions, including the following.

27
### School Psychologist Elrod

28
Elrod testified to her credentials and experience as a school psychologist, with over 5 years'

1   experience on over 250 IEP assessments including in categories of ED and OHI.  (Doc. 28-6 at

2   1184.)  Elrod testified to assisting Hunt in assessing Student in May 2019 while he was a Stine

3   during his kindergarten year, and to her direct involvement with Student at Castle during his first

4   grade year.  (*Id.* at 1189-1202.)

5          Elrod conducted the October 2019 Section 504 assessment and felt Student was eligible for

6   a Section 504 plan based on healthcare provider diagnosed DMDD and ADHD.  (*Id.* at 1213-14.)

7   By November 2019, Student's increased aggression resulted in an offer for additional assessment

8   for special education and related services, to which Mother agreed, in categories of academics,

9   intellectual skills, health, and social/emotional functioning.  (*Id.* at 1238-44.)  Relatedly, Elrod

10  testified to a December 11, 2019 incident where Student hit her in the eye, resulting in needed

11  medical attention and time off from work.  (*Id.* at 1257-58.)  Elrod testified to her observations of

12  Student's off task and defiant, foul-mouthed and unsafe behavior during preparation of her

13  December 2019 IEP,  including throwing things and being violent to the point he was put in

14  restraints.  (*Id.* at 1265-76.)  Elrod testified that during her data gathering, Student was observed to

15  be on task zero percent of the time and over the course of thirty-five minutes he was redirected

16  forty-seven times *(id.* at 1281), on one occasion taking fourteen minutes to follow instructions to

17  close his Chromebook and get to work, which he then did successfully.  (*Id.* at 1283.)

18         Elrod testified the other kids in the general education classroom were scared and confused

19  by Student's maladaptive behaviors including playground behaviors of cursing out peers, pushing

20  them to the point of injury, and flipping them off.  (*Id.* at 1288-89.)  Elrod testified that by the end

21  of her observations for the December 19, 2019 psycho-educational report, Student's maladaptive

22  behaviors were increasing and he was completing little to no academic work.  (*Id.* at 1294-97.)

23  Elrod testified that Mother told her during an interview that Student was very aggressive at home

24  and threatened to hurt others and himself.  (*Id.* at 1303.)  Elrod testified that she interviewed

25  Student and he told her that he gets made for no reasons and when he does not get what he wants, it

26  makes him feel like he wants to kill someone.  (*Id.* at 1306.)

27         Elrod testified that in preparing her December 19, 2019 psycho-educational report, she

28  administered assessments per the IDEA standards.  (*Id.* at 1247-48.)  For example, she testified to

1   her application of the Wechsler Intelligence Scale for Children fifth edition ('WISC'), pursuant to

2   its protocols resulting in an average IQ score.  (*Id.* at 1310-12.)  She also administered the Behavior

3   Assessment for Children Third Edition ("Basque") and she found Student's behaviors consistent

4   with ED and ADHD.  (*Id.* at 1325.)  Elrod concluded in her report that Student met special

5   education eligibility for categories ED and OHI.  (*Id.* at 1326-27.)

6                                         First Grade Teacher Rodriguez

7           Rodriguez testified that her relationship with Student was tumultuous, that he could be

8   loving and also very aggressive with her and to a lesser extent with his peers.  (Doc. 28-6 at 890-

9   94.)  Rodriguez testified that Student's academic performance declined during his first grade year.

10  (*Id.*)  Rodriguez testified that Student had an above average number of disciplinary referral (*id.* at

11  895-96), including more major referrals than she could count.  (*Id.* at 989.)   Rodriguez testified that

12  as Student's maladaptive behaviors increased in intensity, his school work and academics "really

13  began to suffer."  (*Id.* at 899.)  Rodriguez testified that she had a radio in the classroom so she

14  could immediately call for assistance with Student's behavior, and that she used the radio "daily" to

15  do so.  (*Id.* at 897-98.)  Rodriguez testified that Student eloped from the classroom on average three

16  to four times a day and she would radio the behavioral intervention aides ("BIA's") to intervene.

17  (*Id.* at 999.)

18                                         Other District Staff

19          Castle principal Wilson testified that around November 2019, Student started having a lot of

20  aggressive violent behaviors.  (Doc. 28-6 at 1035.)  Wilson testified that Student had 26

21  disciplinary events during the 2019/2020 school year.  (*Id*. at 1049.)  Wilson testified she kept her

22  own log of Student's aggressive behaviors because she feared litigation would result.  (*Id.* at 1053.)

23  School nurse Hernandez testified to her credentials and the legal requirements for special education

24  assessments regarding suspected disabilities and disabilities.  (Doc. 28-6 at 1522-23.)  Hernandez

25  testified to her assessment of Student for the December 2019 IEP pursuant to standards.  (*Id.* at

26  1530-1555.)

27          Special education teacher Keene, who taught at the District's Intensive Intervention Center

28  (where the BIC is housed) testified to her credentials which included an autism spectrum disorder

1   ("ASD") certificate, and six years' experience as a special education teacher.  (*Id.* at 1563-72.)

2   Keene testified that she did the academic assessment of Student for the December 2019 IEP

3   pursuant to standards including administration of the Woodcock-Johnson IV test resulting in

4   low/average results.  (*Id.* at 1576.)  Keene testified that Student became agitated during testing and

5   hit her with a chair.  (*Id.* at 1557-58.)  Keene testified that she observed Student in the classroom

6   approximately 30 times prior to assessing him (*id.* at 1636), and that Student was destructive and

7   that he would lash out at other students (*id.* at 1641).

8                               ***b.   Autism Assessment***

9           The ALJ reasonably found the District's autism assessment to be appropriate.  (Doc. 28-5 at

10  274-78.)  The ALJ credited the testimony of District Program Specialist Bryan Morris, who

11  conducted the February 2020 autism assessment for the Amended IEP.  For example, the ALJ

12  found Morris qualified to perform the assessment, which included records review, interviews, data

13  gathering, administration of the Autism Diagnostic Observation Schedule (ADOS), and rating

14  scales to Mother and teacher Rodriguez including the Autism Spectrum Rating Scales (ASRS), all

15  consistent with IDEA, protocols, producer instructions.  (*Id.* at 274.)

16          The ALJ observed evidence in the record supporting Morris's findings and conclusions,

17  including his observations of Student at school and findings that: Student (i) had social interests,

18  clear use of verbal and nonverbal language which he used appropriately to gain attention, several

19  appropriate reciprocal conversations, no perseveration, and tolerated loud noises; and (ii) did not

20  exhibit any stereotyped behaviors or restricted interests and did not show any sensory interests.  (*Id.*

21  at 275-76.)  Significantly, the ALJ found that Morris did not ignore Student's autistic-like conduct,

22  but rather appropriately accorded it less weight when interpreting and scoring the ADOS, which

23  resulted in a score in the non-spectrum range.  (*Id.*)

24          As to Student's clinical psychology and autism expert, Dr. B.J. Freeman, Ph.D. who

25  provided an October 2020 independent psycho-educational report and testified at the hearing  (*see*

26  Doc. 28-5 at 33-52), the ALJ acknowledged Freeman's "impressive credentials."  (Doc. 28-5 at

27  259-60.)  Still, the ALJ was unpersuaded by Freeman's testimony that Student met (1) the

28  Diagnostic and Statistical Manual of Mental Disorders fifth edition ("DSM") criteria for ASD, and

(2) special education eligibility in the category of autism.  (Doc. 28-5 at 50, 260; *see also* Doc. 28-5 at 48.)  Particularly, the ALJ observed that Freeman's opinion, that "inconsistency is a hallmark of autism," and "throughout all the reports, the one thing that stands out is the inconsistency of Student's behavior," was disputed by District's well credentialed Special Education Coordinator Russell Van Dyke, PhD.  The ALJ found Van Dyke's testimony disputing Freeman's opinions regarding "inconsistency" relative to ASD to be knowledgeable, detailed, and consistent.  (*Id.* at 277-78.)  The ALJ noted that Van Dyke cited to prevailing authority, the DSM, as contrary to Freeman's opinion.  (*Id.*)  The ALJ also noted elsewhere in her decision that under California law, autism is often characterized by "repetitive activities, stereotyped movements, [and] resistance to environmental change or change in daily routines[.]"  (Doc. 28-5 at 257 citing Cal. Code Regs., tit. 5, § 3030(b)(1).)

The ALJ reasonably could discount Freeman's clinical approach to evaluating children on the ADS whereby she disregarded standardized autism test scoring (*see e.g.,* Doc. 28-6 at 2783-84) because Freeman's approach was unsupported by professional standards and testing protocols.  The administrative record does not compel the conclusion that the ALJ clearly erred by affording little weight to the testimony of Freeman.  *See Amanda J.,* 267 F.3d at 889.

Additionally, the ALJ reasonably could credit Van Dyke's testimony that he found the behaviors relied upon by Freeman in opining autism eligibility were much more consistent with Student's ADHD.  (Doc. 28-6 at 2119-24.)  Van Dyke found that Freeman's report was result oriented, reaching an incorrect conclusion of autism eligibility without sufficient supporting data and explanation as to why behavior common to other categories indicated autism.  (Doc. 28-6 at 2119-24.)  Especially so, Van Dyke testified, given that District staff members testified consistently that they did not find Student to present behavior characteristic of autism.  (*Id.*)  Van Dyke also faulted Freeman for not interviewing key teachers and individuals who interacted with Student; her failure to observe Student in the classroom setting; her failure to observe the behaviors which were subject of the rating scales of Mother and teacher;  and her failure to assess pragmatic language or distinguish staff's extensive assessment of it in finding autism ineligibility.  (Doc. 28-6 at 2091-2119.) Van Dyke also questioned Freeman administration of the ADOS notwithstanding then

1   prevailing COVID-19 precautions and constraints on in-person interaction, a practice that was

2   contrary to District policy even if not prohibited by publisher guidelines.  (Doc. 28-6 at 2119-24.)

3         The ALJ went on to observe evidence "[b]oth Morris and Freeman testified that certain

4   characteristics of Student's behavior could be consistent with attention deficit disorder, emotional

5   disturbance, and autism."  (Doc. 28-5 at 277.)  The ALJ found that Morris's conclusion that

6   "Student's behaviors were much more related to, and better explained by his attention deficit

7   hyperactivity disorder" was grounded in considered and thoughtful analysis of Student's many and

8   varied behaviors, and reasonable.  (*Id.* at 275.)

9         Finally, the ALJ observed elsewhere in her decision that Student's presentation was not

10  consistent with suspicion of autism.  The ALJ pointed to the noted evidence that Student was

11  talkative; that he had reciprocal conversations with peers and adults; that he was not sensitive to

12  sound or loud noises; that he did not notably perseverate; that he made eye contact; and that his off-

13  task behaviors and impulsivity were not reasonably associated with a suspicion of autism.  (Doc.

14  28-5 at 257-58.)  The ALJ also observed Freeman's concession that Student's ADHD explained

15  many of his symptoms and mental health issues.  (*Id.* at 258, 260.)  The evidence and testimony in

16  the administrative record preponderates in support of the ALJ's findings and conclusions, including

17  the following.

18                    Morris's Testimony

19         Morris testified to his credentials and approximately 5 years' experience administering

20  autism assessments per standards.  (*Id.* at 1663-71.)  Morris testified to his review of Student's

21  records; his interviews with Mother and teacher Rodriguez; his observations of Student at school

22  which included maladaptive behaviors, aggression, and violence with peers and defiance and off

23  task behavior; his administration of the ADOS-2 test pursuant to standards; and his scoring of

24  ratings on the Autism Spectrum Rating Scale (ASRS).  (*Id.* at 1672-1701; Doc. 28-4 at 17-19.)

25  Morris testified that his assessment evaluated data from all Student's environments including at

26  home.  (*Id.* at 1821.) Morris concluded Student had difficulty with social emotional regulation and

27  hyperactivity impulsivity; that Student's behavior was related to ED and not autism; and that

28  Student was not eligible for special education in the category of autism.  (*Id.* at 1701-59; *see also*

1   Doc. 28-4 at 3-35.)

2                                    Freeman's Testimony

3           Freeman testified to her credentials and forty-nine years' experience in the autism field.

4   (Doc. 28-6 at 2520-32.)  Freeman testified that she evaluated Student on May 25, September 5, and

5   October 9, 2020; reviewed records; interviewed school psychologist Elrod; administered tests; and

6   produced an October 2020 psycho-educational IEE.  (Doc. 28-5 at 2533-52.) Though Freeman

7   testified that the hallmark of autism is inconsistency in the natural (unstructured) environment

8   (Doc. 28-6 at 2520-32), she conceded the DSM looks for repetitive behaviors and difficulties

9   changing routines resulting in disruptive behavior, textural behaviors, and intense interest in

10  specific objects (*id.* at 2541-45). Freeman agreed that eligibility for special education under the

11  category for ED precludes eligibility under the category for autism.  (*Id.* at 2545-49.)  Still, she

12  concluded in rather circular fashion that Student did not meet the autism exception for ED because

13  that diagnosis "is rarely appropriate for children with autism spectrum disorder, a neurological

14  disability." (Doc. 28-5 at 50.)  Though Freeman's report suggests that Student showed significant

15  autism deficits outside the school environment (Doc. 28-5 at 41-42, 47), she attributed many of

16  Student's symptoms to his ADHD (Doc. 28-5 at 258).

17          Freeman acknowledged that her data-gathering and scoring was impacted by COVID-19

18  constraints but maintained that she focused on Student's behaviors and not the assessment scoring.

19  (Doc. 28-6 at 2549-76, 2590.)  Particularly, she testified the ADOS-2 is not alone dispositive of

20  autism (*id.* at 2603-06), and that in her experience the behaviors of Student, especially his

21  inconsistent behaviors, showed special education eligibility for autism notwithstanding scoring.

22  (*Id.* at 2607-26.)

23          Freeman also testified the District's ED finding was flawed because of her stated belief that

24  Student's behaviors and inconsistent behaviors are better explained as autism, especially as to what

25  she characterized as his sensory and obsessive behaviors and difficulties changing routines.  (*Id.* at

26  2640-73.)  She faulted District staff on grounds that some of the behaviors they observed at school

27  could have been consistent with autism.  (*Id.* at 2657-79.)  Even so, Freeman conceded that

28  bullying, hyperactivity, and inattention tend to be associated with ADHD, and that Morris's scoring

                                                    35

1  fell below meeting criteria for ASD.  (*Id.* at 2577-2602.) Significantly, Freeman conceded that in
2  assessing Student, she relied upon incomplete scoring of the parent autism interview (Vineland)
3  forms; that she herself completed some of the responses for Mother, based on her "clinical
4  judgment and assumptions;" and that she did not know if her doing so was allowed under the
5  instructions for that assessment.  (*Id.* at 2695-2742.)

6  　　　　Freeman further conceded that she did not complete all of the protocols for the testing she
7  administered; that she could not tell whether Mother or teacher submitted some of the implicated
8  forms; that she changed some of teacher Rodriguez's scoring on the belief Student's underlying
9  behavior warranted the changes; that she did not include supporting protocols or reflect COVID-19
10 precautions taken during testing; and that she erred in scoring the ADOS.  (*Id.* at 2695-2749.)
11 Ultimately, Freeman conceded that her psycho-educational IEE was not a comprehensive
12 independent evaluation because she did not include any independent cognitive, academic, specific
13 learning disability, or language pragmatics assessment – instead she relied upon the reports of
14 others.  (*Id.* at 2761-64.) Finally, as to placement, Freeman opined that Student's needs "probably
15 one of the most restrictive programs there are due to the severity of his behavior at this point."  (*Id.*
16 at 2681.)

17 <u>Other District Staff</u>

18 　　　　Though the record includes evidence of Student behaviors outside of school that Mother felt
19 could be characteristic of autism, (Doc. 28-6 at 2439 -2453, 2467-71), the District's witnesses
20 consistently testified that autism-like behavior was not a concern at school. Hunt testified that she
21 had observed other kindergarteners to use foul language and hit and kick their peers and teachers
22 and found such behavior in Student was not suggestive of autism.  (Doc. 28-6 at 857-58; *see also*
23 Doc. 28-6 at 691, 757, 840-42, 854, 869.)  Hunt testified that children with OHI, S/L and ED
24 categories of disability can display these behaviors.  (*Id.* at 870.)  Hunt testified that Student's
25 diagnostic scales did not red-flag autism as a possible area of suspected disability.  (*Id.* at 854.)

26 　　　　Elrod did not observe behaviors that raised a concern Student needed to be assessed for
27 autism.  (*Id.* at 1295-96.) Keene testified that she did not observe autism characteristics in Student.
28 (Doc. 28-6 at 1591.) First grade teacher Rodriguez testified that she did not observe Student to

display ASD type behavior and she was not concerned that Student was autistic.  (Doc. 28-6 at 922-23; *see also* Doc. 28-4 at 66.)  Nurse Hernandez did not observe significant conduct by Student that was suggestive of autism.  (Doc. 28-6 at 282-84.)  Principal Wilson testified that though Mother brought up sensory issues and behavior that could be characteristic of autism at the 2/28/20 IEP meeting, Wilson testified these behaviors had not been seen at school.  (Doc. 28-6 at 1098,1100.)  Kindergarten teacher Stevens testified that she did not observe in Student behaviors suggestive of autism.  (Doc. 28-6 at 141-42.)  Occupational therapist Litten testified that she did not have concerns about autism relative to Student.  (Doc. 28-6 at 2413-17.)  Finally, speech pathologist Messiha testified that she did not observe in Student characteristics of autism.  (Doc. 28-6 at 2015-16.)

### c.   ERMHS, OT, and S/L Assessments

The ALJ reasonably found these assessments by District staff were appropriate.  The ALJ considered the February 2020 ERMHS assessment by the District's mental health therapist and licensed clinical social worker, Adriana Corral.  (Doc. 28-5 at 278.)  The ALJ found Corral was qualified to perform the assessment and did so pursuant to the requirements of IDEA, the publisher's instructions, and protocols.  (Doc. 28-5 at 278-79.)  The ALJ observed Corral's data gathering including records review, observations, interviews with Mother, Grandmother, teacher Rodriguez, and Student, and the administration of tests and surveys appropriate to assess functional, developmental and academic information.  (*Id.*)  The ALJ credited Corral's recommendation that Student receive mental health services to help manage his symptoms and behaviors in the school setting.  (*Id.* at 279.)

The ALJ considered the February 2020 OT assessment by the District's occupational therapist, Amanda Litten.  (Doc. 28-5 at 278.)  The ALJ found Litten was qualified to perform the assessment and did so pursuant to the requirements of IDEA, the publisher's instructions, and protocols.  (Doc. 28-5 at 279.)  The ALJ observed Litten's data gathering including record review, observations, interviews, and administration of a variety of tests, and surveys appropriate to assess Student's abilities, resulting a written report that included recommendations.  (*Id.*)

The ALJ considered the February 2020 S/L assessment by the District's speech language

1  pathologist, Sheri Messiha.  (Doc. 28-5 at 278.)  The ALJ found Messiha was qualified to perform

2  the assessment and did so pursuant to the requirements of IDEA, the publisher's instructions, and

3  protocols.  (Doc. 28-5 at 279-80.)  The ALJ observed Messiha's data gathering including record

4  review, observations, interviews, orofacial examination, and the administration of tests and surveys

5  appropriate to assess Student's abilities in the areas tested, resulting in a written report that included

6  recommendations.  (*Id.*)

7        Student's failure to contest on appeal the ALJ's findings and conclusions regarding these

8  three assessments concedes, at least implicitly, their appropriateness. In any event, the evidence and

9  testimony in the administrative record preponderates in support of the ALJ's findings and

10  conclusions regarding the assessments detailed below.

11                    <u>Mental Health Therapist/ LCSW Adriana Corral</u>

12        Corral testified to her credentials and experience of approximately eight and one-half years

13  in her field, including conducting special education assessments per standards, and her conduct of

14  Student's February 28, 2020 EHRMS assessment.  (Doc. 28-6 at 2248-61; *see also* Doc. 28-4 at

15  283-301.)  Corral testified that she reviewed records and Student's past psycho-educational

16  assessments; interviewed Mother, Grandmother, teacher, and Student; administered assessments per

17  standards; and observed Student three times.  (Doc. 28-6 at 2261-2315; *see also* Doc. 28-4 at 283-

18  301.)  Corral found Student struggled to maintain attention and was hyperactive and impulsive.

19  (*Id.*)  Corral found Student to be eligible for mental health services; that his behaviors were

20  impeding his success in the classroom environment; and that he would benefit from such services in

21  the school setting.  (*Id.*) Relatedly, the Amended IEP recommended counseling services and two

22  social emotional goals, to which Mother consented.  (*Id.* at 2316-19; *see also* Doc. 28-4 at 300.)

23  Corral also testified to her familiarity with the BIC and agreed with the special day BIC

24  recommendation for Student because (1) his behaviors were impeding his academics and

25  relationship with peers, and (2) the BIC would provide Student with meaningful educational

26  benefits.  (*Id.* at 2320-24.) Notably, though Hunt testified that she did not review the ERMHS

27  assessment in preparing her FBA, she nonetheless was aware that Corral observed the same

28  behaviors as she did.  (Doc. 28-6 at 825-26.)

District Occupational Therapist Amanda Litten

Litten testified to her credentials and more than two years' experience as an occupational therapist including assessing students in that area pursuant to standards, instructions, and protocols. (Doc. 28-6 at 2349-2400.)  Litten testified to her administration of the February 2020 OT assessment of Student pursuant to standards and protocols, including her review of records, questionnaire to Mother and teachers, and observation of Student.  (*Id.*)   Litten testified that she did not observe any difficulties with fine motor skills or significant sensory related difficulties.  (*Id.* at 2349-2400; *see also* Doc. 28-4 at 204-80.)  Litten testified to her conclusion that Student did not require OT support to participate in activities at school.  (*Id.* at 2401; *see also* Doc. 28-4 at 204-80.)

Special and Language Specialist Sheri Messiha

Messiha testified to her credentials and over four years' experience in the area of speech and language disorders including administration of assessments pursuant to standards and protocols. (Doc. 28-6 at 1921-45.)  Messiha testified to her assessment of Student in February 2020 including record review, interviews with teacher and Mother, observations of Student at school, and administration of assessments.  (*Id.* at 1921-45.)  Messiha found Student to be engaging; that he exhibited social reciprocity; and that he liked to draw attention to himself.  (*Id.*)  Messiha administered a number of assessments per standards and concluded that Student's language was in the average range.  Messiha found that Student did not meet the special education eligibility category for speech and language.  (*Id*. at 1945-78; *see also* Doc. 28-4 at 19-37.)

### d. *Special Education Eligibility, Placement, Behavioral Interventions, and Related Services*

Special Education Eligibility

The ALJ reasonably found that the District's Amended IEP offering primary special education eligibility under the category of ED and secondary special education eligibility under the category of OHI was appropriate and not a denial of a FAPE.  (Doc. 28-5 at 280-83.) The ALJ credited the noted persuasive testimony of District staff members Elrod, Van Dyke, Messiha, Ruiz and Morris, as unequivocally demonstrating primary eligibility under the category of ED was the appropriate choice.  (*Id.*)  Particularly, the ALJ observed the noted evidence that Student

39

1  demonstrated ongoing inappropriate and physically aggressive behavior and difficulties with

2  satisfactory interpersonal relationships with teachers and peers adversely affecting his educational

3  performance.  (*Id.* citing 34 C.F.R. § 300.8(c)(4); Cal. Code Regs., tit. 5, § 3030(b)(4).)

4       The ALJ correctly observed that in cases such as this one, where educational performance is

5  adversely affected primarily by ED, eligibility under the autism category is precluded.  (Doc. 28-5

6  at 281-82 citing; 34 C.F.R. § 300.8(c)(1); Cal. Code Regs., tit. 5, § 3030(b)(1).)  Additionally, the

7  ALJ reasonably found that evidence of Student's limited alertness due to ADHD adversely

8  affecting his educational performance, supported special education eligibility under the secondary

9  category of OHI.  (Doc. 28-5 at 280-83.)  Finally, The ALJ also did not err by observing that in any

10 event, IDEA did not entitle Student to eligibility under the proper category of disability, as long as

11 Student is found eligible under any category.  (Doc. 28-5 at 283 citing 20 U.S.C. § 1412(a)(3)(B);

12 *Weissburg v. Lancaster School District*, 591 F.3d 1255, 1259 (9th Cir. 2010).)  Thus, the ALJ did

13 not err in finding that Student was not denied a FAPE based upon the IEP's special education

14 categorical eligibility determinations.  (Doc. 28-5 at 284.)

15                    <u>Placement in the Special Day BIC and Behavioral Interventions</u>

16       The ALJ reasonably found that the District's Amended IEP offering placement in the

17 special day BIC was tailored to Student's unique needs and allowed meaningful progress in the

18 least restrictive environment, i.e., a FAPE in the LRE.  (Doc. 28-5 at 285-86 citing 20 U.S.C. §

19 1412 (a)(5)(A); 34 C.F.R. §§ 300.114(a)(2), 300.116; Educ. Code, § 56033.5; *Rowley*, 458 U.S. at

20 201-204.)  The ALJ appropriately considered the factors set out by the Ninth Circuit in *Rachel H.*

21 for placement of a student outside the general education environment, *viz.*: (i) "the educational

22 benefits of placement full-time in a regular class," (ii) "the non-academic benefits of such

23 placement," (iii)  the effect [the student] had on the teacher and children in the regular class," and

24 (iv) "the costs of mainstreaming [the student]."  (Doc. 28-5 at 286 citing *Rachel H.* 14 F.3d at 1404;

25 Educ. Code § 56361.)  The ALJ, in the course thereof appropriately considered whether the IEP

26 mainstreamed Student to the maximum extent appropriate given the continuum of program options.

27 (Doc. 28-5 at 286 citing *Daniel R.R. v. State Board of Education*, 874 F.2d 1036, 1050 (5th Cir.

28 1989).)

The ALJ reasonably found the *Rachel H.* factors and particularly factor "iii" above supported placement of Student in the special day BIC, with some mainstreaming as provided in the IEP offer.  (Doc. 28-5 at 285-91.)  Particularly, the ALJ pointed to the evidence of Student's maladaptive behaviors and aggressions in the general education setting, which by February IEP had escalated to:

> [T]he point of seriously injuring staff and being himself subjected to restraints. As mentioned above, principal Wilson began keeping a contemporaneous log of incidents starting in November 2019, in anticipation of litigation. Between November 2019 and February 2020, Student had had behavioral incidents causing injuries too numerous to summarize, but which included bruising Rodriguez' ribs, giving Elrod a black eye, and throwing a chair at an aide hitting her hand. Student had been suspended, restrained, and the subject of behavioral emergency reports. The other Rachel H. factors also made general education not appropriate.

(Doc. 28-5 at 287.) The ALJ acknowledged the IEP team's discussion of placement options, and considered the IEP offered by the District, which included:

> [P]lacement in a special day class, in a behavior intervention program. Panama's proposed program was designed to address extreme physically aggressive behaviors while providing grade level academics. The placement offered was not determined based on eligibility category. There were students in the proposed program with different disabilities, including autism, Parent's preferred eligibility category. Panama's behavior intervention class focused on academics, behavior and therapy and had a behavior "levels" system, a daily point system, a regulation zone within the classroom, social skills groups, core curriculum instruction, and supports provided by a mental health therapist and a school psychologist. There were never more than 10 students in the classroom, and it had a special education teacher and approximately three behavior aides. The program's goal was to decrease behavior problems so that students could eventually return to general education.
>
> The IEP as amended in February 2020, provided for 1,755 weekly minutes of specialized academic instruction, 60 minutes per month of behavior intervention services, 180 minutes monthly individual counselling and 60 minutes monthly parent and family counselling services. The IEP offered curb-to-curb transportation, and extended school year services for the summer of 2020. The extended school year services offered consisted of 1200 weekly minutes of specialized academic instruction, 30 minutes per month of behavior intervention services, 60 minutes monthly individual counselling and curb-to-curb transportation. Mainstreaming was offered for lunch, recess and school wide activities.

(Doc. 28-5 at 288.)  The ALJ found this placement credibly supported by the detailed testimony of District staff including Van Dyke, Corral, and Ruiz, all of whom the ALJ found well-qualified to

1  opine thereon including the related academic, behavioral and therapeutic supports therein. (Doc.

2  28-5 at 289-90.)  The ALJ also found persuasive the placement's suitability given Student's unique

3  needs, including behavioral intervention, grade level academic curriculum, therapeutic counseling,

4  and ability to earn access to mainstreaming.  (Doc. 28-5 at 289-90.)

5         Significantly, the ALJ found her above conclusions were bolstered by the similarity

6  between the IEP placement and the program recommended by Student's expert Freeman, but in a

7  less restrictive environment than that proposed by Freeman.  (Doc. 28-5 at 290.)  Regarding the

8  latter, the ALJ reasonably found Freeman's opinion favoring a more restrictive program for

9  Student, i.e. a program of one-on-one instruction in a separate class with no other students present,

10  to be "unclear and unconvincing," and uninformed as to the nature of District's behavior program

11  classes.  (*Id.*)  The noted evidence and testimony reasonably support the ALJ's discounting

12  Freeman's report and testimony that a one-on-one instructional environment could provide Student

13  with a FAPE in the LRE, for the reasons stated.

14         Finally, the ALJ observed that the only evidence relating to relative cost of placement

15  options (i.e. *Rachel H*. factor "iv") was testimony offered by principal Wilson, that she had used

16  general funds to provide behavioral support for Student in the general education classroom.  (Doc.

17  28-5 at 287.)  Any weight given that evidence reasonably would favor the District's placement

18  offer. Given the foregoing, the ALJ did not err, and reasonably found the District's IEP and

19  proposed special day BIC placement could provide significant benefit to Student in addressing his

20  problematic behaviors in the least restrictive environment.  (Doc. 28-5 at 291.)

21                          Special Education Related Services

22         The ALJ reasonably found the Amended IEP offered Student appropriate related services

23  and behavioral supports.  (Doc. 28-5 at 293-95.) The ALJ observed IDEA's requirement the

24  Amended IEP include related transportation, behavioral interventions, and supportive services, with

25  sufficient detail as may be required to assist Student in benefiting from special education.  (*Id.*

26  citing 20 U.S.C. §§ 1401(26), 1414(d)(1)(A)(i)(IV), 1414(d)(3)(B); 34 C.F.R. §300.320(a)(4)(7);

27  Educ. Code, § 56345(a)(4-7); Educ. Code § 56521.1(b).) The ALJ observed evidence in the record

28  that the IEP offered:

                                      42

60 minutes per month of behavior intervention services, 180 minutes monthly individual counselling and 60 minutes monthly parent and family counselling services. The IEP offered transportation and extended school year services. On February 28, 2020, Mother partially consented to the amended IEP, but only to the individual and family counselling services.

[. . .]

The behavior intervention plan appropriately addressed Student's behaviors, the impact of the behaviors, and predictors for his behaviors. It suggested environmental changes in line with the

accommodations outlined below. It reiterated the hypothesized function of the behavior. It gave detailed instructions to teachers and staff as to how to correct and re-direct Student, how to state desired behaviors and expectations, and how to exhibit and model calm demeanor. It recommended specific methods to praise Student and encourage appropriate behavior from him. It provided detailed teaching strategy and curriculum suggestions, reinforcement procedures, strategies, and directions to staff. The behavior intervention plan was detailed, extensive, and thoughtful. The plan was consistent with the functional behavioral assessment, which as discussed above, was appropriately conducted.

(Doc. 28-5 at 294.)

Also, the ALJ reasonably found the Amended IEP offered appropriate accommodations. For example, the ALJ pointed to evidence that the District would provide warnings before transitions; a visual schedule; frequent breaks; individual testing; extended time to complete assignments; use of a timer to signal the end of breaks; no timer during testing; frequent checks for understanding; use of self-monitoring strategies and calming activities; and sensory aides such as a wobble seat or cushion, and access to a weighted blanket. (Doc. 28-5 at 294-95; *see also* Doc. 28-6 at 904-07, 1100-02, 1159-60, 1351-58.)

### e.    *IEP Goals*

The ALJ reasonably found the Amended IEP's goals, i.e., the four academic goals proposed at the December 19, 2019 IEP meeting and the five additional goals proposed at the February 28, 2020 IEP meeting (i.e. three replacement behavioral goals and two social goals) were proven by evidence admitted and the testimony presented by the District's witnesses, and appropriate for Student. (Doc. 28-5 at 291-93.) The ALJ observed IDEA's requirement that an IEP:

1
2
3

Contain measurable annual goals, including academic and functional goals, that enable the child to be involved in and make progress in the general education curriculum, and that otherwise meet the child's educational needs.  (20 U.S.C. § 1414(d)(1)(A)(II); 34 C.F.R. § 300.320 (a)(2); Educ. Code, § 56345, subd. (a)(2).)

4
5

Show a direct relationship between the present levels of performance, the goals and objectives, and the specific educational services to be provided. (Cal. Code Regs., tit. 5, § 3040.)

6
7
8
9

When appropriate, should include short-term objectives that are based on the child's present levels of academic achievement and functional performance, a description of how the child's progress toward meeting the annual goals will be measured, and when periodic reports of the child's progress will be issued to the parent. (20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320; Ed. Code, § 56345, subd. (a)(3).)

10 (Doc. 28-5 at 291.)

11        Unpersuaded by Student's assertions otherwise, the ALJ reasonably found the goals were

12 objectively measurable based on Student's present levels of academic achievement and functional

13 performance, and reasonably could be attained within the annual IEP term.  (*Id.* at 292; *see also*

14 Doc. 30 at 23; Doc 32 at 5); *K.M. by & through Markham v. Tehachapi Unified Sch. Dist.,* 2017

15 WL 1348807 at *18 (E.D. Cal. Apr. 5, 2017) (citing *Rowley*, 458 U.S. at 206) ("The precise form

16 that a goal takes is a question of educational policy, and courts should not substitute their own

17 notions of sound educational policy for those of the school authorities which they review.").

18 Particularly, the ALJ reasonably found the four academic goals drafted by special education teacher

19 Keene flowed from the assessments and testing presented at the December 19, 2019 IEP meeting.

20 (*Id.*)

21        The ALJ reasonably found the three behavioral goals flowed from Hunt's FBA presented at

22 the February 28, 2020 IEP meeting and were supported by Hunt's ABC chart and underlying data

23 points as well as her behavioral hypothesis, as discussed above. (*Id.*). The ALJ reasonably found

24 the two social/emotional goals flowed from Corral's assessment presented at the February 28, 2020

25 IEP meeting, and were supported by Corral's credible testimony as being measurable and attainable

26 within the applicable one year period.  (Doc. 28-5 at 293.) Given the foregoing, the ALJ reasonably

27 went on to find the IEP goals were appropriate for Student in all areas of Student's unique needs,

28 i.e. academic, behavioral, and social/emotional, based upon the ALJ's reasoned and thorough

44

1   review of the evidence before her.  (*Id.; see also K.M.,* 2017 WL 1348807 *at \*17(*"So long as the

2   goals, as a whole, address the student's needs and enable progress appropriate in light of the

3   student's circumstances, the IEP is appropriate.").

4          The evidence and testimony in the administrative record preponderates in support of the

5   ALJ's findings and conclusions regarding these assessments. For example, in addition to the

6   evidence discussed above, Ruiz testified the February 28, 2020 IEP team reviewed the above noted

7   assessments, the BIP, and the related goals.  (Doc. 28-6 at 2833-48.)  Ruiz testified that

8   replacement behavioral goals offered with the February 28, 2020 Amended IEP had baselines and

9   objectives, were measurable, appropriately ambitious, and could be implemented in the BIC.  (Doc.

10  28-26 at 2830-33.)

11         Elrod testified at some length that the goals developed in the December 2019 IEP were

12  supported by the assessments, had objectives, could be implements by special and general

13  education teachers, and were measurable.  (Doc. 28-6 1338-50.) Keene testified that the academic

14  goals she wrote for the December 2019 IEP had baselines from the Woodcock-Johnson test and her

15  observations of Student and were objective and measurable and attainable in the special education

16  environment.  (*Id.* at 1593-1634, 1645-55.)

17         Furthermore, to the extent Student asserts three of the goals newly added with the February

18  28, 2020 Amended IEP (i.e., the two social/emotional [EHRMS] goals addressing (1) Student's

19  poor mood regulation, and (2) Student's deficit in social relationships, and (3) the additional

20  behavioral [BIP] goal addressing Student's failure to address adults in a respectful manner) were

21  not written into the Amended IEP in violation of IDEA (*see* Doc. 30 at 23-24), the ALJ did not err

22  in finding these goals were before the IEP team and part of the Amended IEP as discussed at the

23  February 28, 2020 IEP meeting.  (*See* Doc. 28-4 at 303 through Doc. 28-5 at 19; Doc. 28-6 at 2316-

24  17, 2843-44.)

25         Particularly, the minutes of that meeting reflect the team's review of these three goals and

26  the predicate written assessments, all accurately stated and included as part of the Amended IEP

27  offer; Mother's agreement to implementation of the two EHRMS goals; and addition of the new

28  behavioral goal which was added at the request of the parent advocate.  (*Id.*; *cf.  M.C. by & through*

1    *M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1197 (9th Cir. 2017)) (school

2    district's inaccurate offer of services within the individualized education program and its later

3    unilateral revision of that program, violated IDEA.  Also, Ruiz testified that hard copies of all

4    goals were provide to the IEP team at the February 28, 2020 meeting.  (*Id.* at 2848-54.)  The ALJ in

5    these regards reasonably could find that Mother was able to respond to the District's data and give

6    her informed consent at the February 28, 2020 IEP meeting.  (*Cf.* Doc. 32 at 5.)

7                    *f.      FAPE in the LRE*

8            The ALJ reasonably found the Amended IEP offered a FAPE in the LRE.  (Doc. 28-5 at

9    295.) The ALJ found the District did not deny Student a FAPE by choosing ED and OHI as the

10   special education eligibility categories.  (Doc. 28-5 at 281-83 citing *Weissburg*, 591 F.3d at 1259

11   (the IDEA "does not give a student the legal right to a proper disability classification.").

12           The ALJ found the Amended IEP offer was "designed to address Student's behaviors,

13   whether he was classified as emotionally disturbed or autistic, through intensive applied behavioral

14   analysis-based instruction"  (Doc. 28-5 at 290), with a program similar to that recommended by

15   Student's expert, Dr. Freeman, but less restrictive (Doc. 28-5 at 290). The ALJ found the Amended

16   IEP offered (1) special education and related services reasonably calculated to provide Student with

17   educational benefit at the time it was proposed (Doc. 28-5 at 284-86), and (2) appropriate and

18   measurable annual goals, each supported on the hearing record (Doc. 28-5 at 292).

19           In the context of her findings discussed above, the ALJ concluded:

20                   Panama's proposed program was designed to address extreme physically
                     aggressive behaviors while providing grade level academics  .  .  .
21                   Panama's behavior intervention class focused on academics, behavior,
                     and therapy and had a behavior "levels" system, a daily point system, a
22                   regulation zone within the classroom, social skills groups, core
                     curriculum instruction, and support provided by a mental health therapist
23                   and a school psychologist.  There were never more than 10 students in
                     the classroom, and it had a special education teacher  and approximately
24                   three behavior aides.  The program's goal was to decrease behavior
                     problems so that students could eventually return to general education.
25                   The IEP as amended in February 2020, provided for 1,755 weekly
                     minutes of specialized academic instruction, 60 minutes per month of
26                   behavior intervention services, 180 minutes monthly individual
                     counseling  and 60 minutes monthly parent and family counselling
27                   services.  The IEP offered curb-to-curb transportation, and extended
                     school year services for the summer of 2020.  The extended school year
28                   services offered consisted of 1200 weekly minutes of specialized

1
2

> academic instruction, 30 minutes per month of behavior intervention services, 60 minutes monthly individual counselling and curb-to-curb transportation.  Mainstreaming was offered for lunch, recess, and school wide activities.

3

4   (Doc. 28-5 at 288.)  The ALJ further concluded that:

5
6
7
8

> [The] placement offer was based upon and supported by a considerable amount of data collected from numerous professionals and multiple assessments and observations of Student.  The evidence was convincing that [the . . .] proposed program could provide significant benefit to the Student in addressing his problematic behaviors.  Panama provided that its offer of placement in a special day class was an appropriate placement for Student in the least restrictive environment.

9   (*Id.* at -291.)

10
11
12

The IDEA requires states receiving federal assistance for the education of disabled children to establish procedures assuring that special education students are educated in the least restrictive environment ("LRE"), that:

13
14
15
16
17

> "[T]o the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

18
19
20
21
22
23
24

20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.114.  This is referred to as IDEA's "mainstreaming" requirement.  *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 847 (9th Cir. 2016); *see also Rachel H.*, 14 F.3d at 1403. Though the IDEA states a strong preference for mainstreaming, it is not an absolute requirement.  *Poolaw v. Bishop*, 67 F.3d 830, 836 (9th Cir. 1995).  There is "a natural tension within the IDEA as state educators try to establish appropriate educational programs for handicapped children to meet their unique needs while attempting to comply with the IDEA's clear preference for mainstreaming."  *Id.* at 834.

25
26
27
28

The regulations implementing § 1412(a)(5) further clarify what constitutes the LRE.  To conform with the LRE requirement, a placement should be "as close as possible to the child's home."  34 C.F.R. § 300.116(b)(3).  Additionally, "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if

47

1    nondisabled." 34 C.F.R. § 300.116(c).  Consideration must be given "to any potential harmful

2    effect on the child or on the quality of services that he or she needs," and no child with a disability

3    may be excluded from regular classrooms "solely because of needed modifications in the general

4    education curriculum." 34 C.F.R. § 300.116(d),(e).  The question of whether a placement

5    constitutes a LRE is "necessarily an individualized, fact specific inquiry."  *Poolaw*, 67 F.3d at 836.

6         The evidence and testimony in the administrative record preponderates in support of the

7    ALJ's findings and conclusions.  For example, in addition to the evidence discussed above,  Hunt

8    testified to the appropriateness of the Amended IEP given Student's demonstrated unique needs.

9    (Doc. 28-6 at 852-71.)  Ruiz testified that (1) the special day BIC was the appropriate placement for

10   Student based on his unique needs including academic skill level and underlying behavior (Doc.

11   28-6 at 2817-22), and (2) she did not view Freeman's recommended placement as appropriate

12   because it was not a FAPE in the LRE, and the District would not be able implement the one-on-

13   one instruction Freeman proposed (*id.* at 2867-68). Elrod testified the Amended IEP provided a

14   FAPE in the LRE.  (*Id.* at 1361-62, 1406.)

15                    ***g.      Parental Consent and Ability to Implement***

16        After appropriately finding the Amended IEP was necessary to provide Student with a

17   FAPE in the LRE, the ALJ reasonably concluded the Amended IEP could be implemented without

18   parental consent, "if Mother wants Student to receive special education and related services."

19   (Doc. 28-5 at 295, 300; *see also* Educ. Code § 56346(f).)  Student has not argued much less

20   demonstrated clear error, and the Court finds none.

21        Additionally, the ALJ declined to address Student's contention that "the IEP cannot be

22   implemented in the distance learning model that has been necessitated by the closure of schools

23   because of COVID-19." (Doc. 28-5 at 295.)  The ALJ found that whether a student was offered or

24   denied a FAPE is determined by looking to what was reasonable as of February 28, 2020, the date

25   the Amended IEP was developed.  (*Id.* citing *Adams*, 195 F.3d at 1149.) The Court finds no clear

26   error in these regards.  As stated in *Adams*:

27              An individualized education program ("IEP") is a snapshot, not a
              retrospective. In striving for "appropriateness," an IEP must take into
28              account what was, and was not, objectively reasonable when the

                                        48

1    snapshot was taken, that is, at the time the IEP was drafted.

2    195 F.3d at 1149 (citing *Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1041 (3d Cir.

3    1993)).  The ALJ reasonably found unpersuasive Student's assertion that the reasonableness and

4    appropriateness of the Amended IEP should be determined as of a time subsequent to February 28,

5    2020, the date it was drafted and offered for implementation.  The caselaw proffered by Student is

6    not a reason to find otherwise because that authority relies upon *Adams* and is readily

7    distinguishable on the facts.  (*See* Doc. 30 at 22, 27-8 citing *M.P.*, 689 F.3d. at 1055; Doc. 32 at 9-

8    10, citing *J.G. v. Douglas County Sch. Dist.* 552 F.3d 786, 810 (9th Cir. 2008); *Marc M. v. Dept. of*

9    *Educ.*, 762 F. Supp 2d 1235, 1244 n.2 (D. Haw. 2011).

10   **E.    Attorneys' Fees**

11       Student seeks an award of prevailing party attorneys' fees on the issues raised in the

12   underlying complaint and as arising from the ALJ's decision, pursuant to 20 U.S.C. §

13   1415(i)(3)(B)(i)(I).  (Doc. 1 at 14-15; *see also* Doc. 32 at 11.)  The Court has discretion to award

14   reasonable attorneys' fees in actions brought under IDEA.  20 U.S.C. § 1415(i)(3); 34 C.F.R. §

15   300.517; Educ. Code § 56346(f).  Parents are prevailing parties if  they "succeed [ ] on any

16   significant issue in litigation which achieves som*e* of the benefit [they] sought in bringing the suit."

17   *M.C.*, 858 F.3d at 1201 (citing *Park* v. *Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th

18   Cir. 2006)). Student is not the prevailing party in this appeal and is not entitled to attorneys' fees,

19   for the reasons stated.[9]

20                                              **VI. CONCLUSIONS**

21       The district court must affirm the administrative decision if in its independent judgment, a

22   preponderance of the evidence supports the hearing officer's findings and conclusions.

23       The Court, on deferential review, finds in its independent judgment that a preponderance of

24   the evidence in the administrative record supports the ALJ's March 15, 2021 findings and

25   conclusions on appealed Issues 2 and 3, therein. Thus, the Court **ORDERS:**

26       1.    The ALJ's March 15 2021 Decision is **AFFIRMED**.

27       2.    Student's request for prevailing party attorneys' fees on the appeal as to Issues 2 and

28   ────────────────────
     [9] See n.4.

                                                    49

3 is **DENIED**.

3. **Within 10 days** of the filed date of this order, the parties **SHALL** file a joint report setting forth the status of this action and the parties' intentions and requests, if any, for further scheduling and prosecution of the case.

IT IS SO ORDERED.

Dated:   **June 26, 2024**

UNITED STATES DISTRICT JUDGE

50